John GLENN, Petitioner–Appellant,

v.

Arthur TATE, Jr., Warden,
Respondent–Appellee.

No. 93–3568.

United States Court of Appeals,
Sixth Circuit.

Argued April 5, 1995.

Decided Dec. 21, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied Feb. 26, 1996.

William S. Lazarow, Jane P. Perry (argued and briefed), Public Defender's Office, Ohio Public Defender Commission, Columbus, OH, for Petitioner–Appellant.

Donald G. Keyser, Asst. Attorney Gen. (argued and briefed), Office of the Attorney General of Ohio, Columbus, OH, for Respondent–Appellee.

Before: GUY, NELSON, and SILER, Circuit Judges.

NELSON, J., delivered the opinion of the court, in which GUY, J., joined. SILER, J. (pp. 1212–14), delivered a separate opinion concurring in part and dissenting in part.

## DAVID A. NELSON, Circuit Judge.

This is an appeal from the denial of a writ of habeas corpus sought by an Ohio prisoner who is under a sentence of death, imposed on the recommendation of a jury, for aggravated murder. The petitioner contends, among other things, that he failed to receive effective assistance of counsel, to his prejudice, at the sentencing phase of his trial.

Under Ohio law, the defendant in a murder case that is tried to a jury cannot be sentenced to death unless the jury finds, beyond a reasonable doubt, that the aggravating circumstance—here the fact that the victim was a peace officer—outweighs any mitigating circumstances. Perhaps the most significant of the potentially mitigating circumstances in this case was the fact that, according to evidence elicited after sentence had been imposed, the petitioner—a young man who had been classified in school as mentally retarded, who was apparently acting at the instigation of an older brother, and who was highly susceptible to suggestion by people he admired—suffered from global brain damage sustained before he was born. Expert testimony that the petitioner's brain function was organically impaired would have been readily available if the petitioner's lawyers had sought it. They failed to do so—and they compounded this error by a series of mistakes which, among other things, led to the jury being presented with uncontradicted expert evidence that the offense was *not* the product of mental retardation or organic brain disease.

So serious were the lawyers' mistakes, in our view, that the lawyers were not functioning as the "counsel" to which the accused was entitled under the Sixth Amendment. And because of the lack of adequate representation, the result reached in the sentencing proceeding was simply not reliable. While affirming the denial of habeas relief insofar as the petitioner's murder conviction is concerned, we shall direct that the writ of habeas corpus be granted unless the petitioner is resentenced.

## I

Although the petitioner, John Glenn, has consistently maintained his innocence, the prosecution presented strong evidence that it was he who shot and killed a part-time deputy sheriff, John Litch, Jr., in October of 1981. The shooting occurred during an attempt to free Robert Glenn, an older brother of John Glenn, from the deputy's custody.

Robert Glenn, an inmate at the Mahoning County jail in Youngstown, Ohio, was periodically taken to a local hospital for treatment of a broken leg. He apparently devised a plan for an escape to be staged en route to the hospital, and he got John Glenn to help him carry the plan out. (Robert was later tried and convicted on charges of escape and involuntary manslaughter, and the evidence presented at his trial was characterized by the prosecution as showing that it was Robert Glenn who planned the escape; "his signature is all over this escape plan," the prosecution argued in Robert Glenn's case.)

Deputy Sheriff Litch drew the assignment of driving Robert to the hospital on the day in question. Before the trip was completed, the evidence showed, a turquoise and black car struck the deputy's vehicle from the rear at a busy intersection. When the deputy got out of his cruiser and approached the driver

of the other car, the latter shot him at point-blank range with a sawed-off shotgun. The victim died almost immediately.

Robert Glenn and the other man fled the scene in the car. John Glenn was arrested a few hours later at the home of his girlfriend, Alseen Lanier. Ms. Lanier testified at trial that John told her he had killed a police officer and that she should keep this a secret.

At approximately the same time as the shooting, Otis Simmons, an acquaintance of John Glenn, was stopped by a police officer for reasons unrelated to the homicide. While Simmons was in the officer's cruiser, a call came over the radio about the shooting of Deputy Litch. Simmons then told the officer that earlier in the day John Glenn had told him he was going to "escape" his brother Robert.

The crime occurred three days after the effective date of the 1981 legislation that cured constitutional defects in Ohio's death penalty law. See Ohio Rev.Code §§ 2929.02 et seq. A Mahoning County grand jury indicted John Glenn, who was 19 years old at the time, for aggravated murder. The indictment specified that the victim of the offense was a peace officer engaged in his duties. The charge was one for which the death penalty could be imposed under Ohio Rev. Code §§ 2929.03 and 2929.04(A)(6).

Publicity about the case was so extensive in the Youngstown area that the Mahoning County Common Pleas Court was unable to seat a jury after twenty-three days of voir dire. Mr. Glenn's appointed trial counsel moved for a change of venue, and the case was sent to nearby Portage County for trial.

Both Ms. Lanier and Mr. Simmons testified at the trial. In addition to their highly incriminating testimony, the prosecution introduced a chemical test which revealed that John Glenn had significant amounts of barium on this hands, consistent with the recent use of a weapon. There was evidence that Robert Glenn's mother had a turquoise and black car that had been driven by John Glenn on the morning of the murder. Plaster scrapings found in the car matched the plaster of Robert Glenn's leg cast.

The jury found John Glenn guilty as charged. A few days later, after a relatively brief evidentiary hearing on the sentence, the jury recommended imposition of the death penalty. The trial court accepted the recommendation.

After exhausting his state remedies on direct appeal and in post-conviction proceedings, Glenn petitioned the United States District Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court denied the petition, and this appeal followed.

**II**

The appellant's strongest argument is that he failed to receive effective assistance of counsel during the penalty phase of his trial. To obtain relief on such a ground, he must show both that his counsel's performance "fell below an objective standard of reasonableness" and that he was prejudiced as a result. Strickland v. Washington, 466 U.S. 668, 687–88, 692, 104 S.Ct. 2052, 2064–65, 2067, 80 L.Ed.2d 674 (1984).

The state court of appeals to which Glenn appealed from the trial court's denial of post-conviction relief concluded that the performance of Glenn's counsel was not objectively reasonable. The denial of relief was nonetheless upheld on the theory that Glenn could not demonstrate prejudice. An appeal from this decision was dismissed without opinion by the Supreme Court of Ohio.

Like the state court of appeals, the federal district court rested its disposition of the ineffective assistance question solely on the "prejudice" branch of the Strickland inquiry; the district court pretermitted the issue of whether the lawyer's performance could pass constitutional muster. We must review the entire question de novo, see Strickland, 466 U.S. at 698, 104 S.Ct. at 2067, and Sims v. Livesay, 970 F.2d 1575, 1579 (6th Cir.1992), and respect for our state and federal colleagues who have already examined the question prompts us to pay particularly close attention to the prejudice aspect.

Under Ohio's death penalty statute, the trial jury was required to weigh against the aggravating circumstances of the crime "the history, character, and background of the

offender," among other things. Ohio Rev. Code § 2929.04(B). The jury was also required to consider whether, "because of a mental disease or defect," the offender "lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." Ohio Rev.Code § 2929.04(B)(3). And the jury was required to consider "[a]ny other factors that are relevant to the issue of whether the offender should be put to death." Ohio Rev.Code § 2929.04(B)(7). The jury could consider none of these matters, of course, if the relevant facts were not placed before it.

Here the jury was given virtually no information on John Glenn's history, character, background and organic brain damage—at least no information of a sort calculated to raise reasonable doubt as to whether this young man ought to be put to death. It was not that such information could not be found, or that counsel made a reasoned decision to withhold the information for tactical or strategic reasons. The information was not presented to the jury because counsel never took the time to develop it.[1]

Although both of Glenn's court-appointed lawyers were experienced criminal defense attorneys, and although they had some eight months to get ready for sentencing proceedings necessitated by a verdict that could hardly have come as a surprise to them, evidence presented to the state trial court at a post-sentence hearing showed that the lawyers made virtually no attempt to prepare for the sentencing phase of the trial until after the jury returned its verdict of guilty. It was obvious, or should have been, that the sentencing phase was likely to be "the stage of the proceedings where counsel can do his or her client the most good," *Kubat v. Thieret*, 867 F.2d 351, 369 (7th Cir.), *cert. denied*, 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989)—yet Glenn's counsel failed to make any significant preparations for the sentencing phase until after the conclusion of the guilt phase. This inaction was objectively unreasonable. "To save the difficult and

time-consuming task of assembling mitigation witnesses until after the jury's verdict in the guilt phase almost insures that witnesses will not be available." *Blanco v. Singletary*, 943 F.2d 1477, 1501–02 (11th Cir.1991), *cert. denied*, 504 U.S. 943, 112 S.Ct. 2282, 119 L.Ed.2d 207 (1992).

Only one of Glenn's lawyers did any preparatory work at all following the verdict, and his efforts were largely misdirected. He arranged for the preparation of a videotape which, if the members of the jury had been permitted to see it, would have shown them the physical appearance of the neighborhood where Glenn grew up and would have enabled them to hear commentary by a narrator, by John Glenn's mother, and by a trucker for whom Glenn had once worked. The admissibility of such a videotape was obviously questionable, but counsel sought no advance ruling on the issue. When the videotape was sought to be shown to the jury, the trial court held—properly, in our view, see *Lockett v. Ohio*, 438 U.S. 586, 604 n. 12, 98 S.Ct. 2954, 2965 n. 12, 57 L.Ed.2d 973 (1978)—that it was inadmissible hearsay.

Although the jury did not see the videotape, neither John Glenn's mother nor the former employer was called to present live testimony. Aside from the producer-narrator, who testified briefly as to the preparation of the videotape, the only mitigation witnesses the jury heard were a minister and a teacher who had known John Glenn when he was small but had seen nothing of him for years; a minister who did not know him at all but attempted—without much success, most of the proposed testimony being ruled inadmissible—to present theological objections to the death penalty; and a lawyer who expressed the opinion that although John Glenn had a delinquency adjudication and a record that included some arrests and misdemeanor convictions, he did not have a "significant" criminal record. (This testimony pertained to one of the statutory mitigation factors, "[t]he offender's lack of a significant history of prior criminal convictions and de-

1. See *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir.1991), *cert. denied*, 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992), where the court "reject[ed] the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them."

linquency adjudications." Ohio Rev.Code § 2929.04(B)(5).)

John Glenn himself made a brief unsworn statement to the jury. The statement, in its entirety, was as follows:

"I am—I am not guilty. I should not be given the—I should not be given the death sentence for a crime I did not commit. Thank you."

None of Glenn's relatives testified, although a number of them would have been willing to do so if asked.

The prosecutor told the jury in final argument that "you received little by way of mitigation at the supposed mitigation hearing." This was certainly true; the jury *did* receive very little by way of mitigation evidence at what was supposed to be the mitigation hearing.

The reason for the paucity of mitigation evidence, as we have said, was lack of preparation on the part of Glenn's lawyers. The lawyers made no systematic effort to acquaint themselves with their client's social history. They never spoke to any of his numerous brothers and sisters. They never examined his school records. They never examined his medical records (including an emergency room record prepared after he collapsed in court one day) or records of mental health counseling they knew he had received. They never talked to his probation officer or examined the probation officer's records. And although they arranged for tests, some months before the start of the trial, to determine whether he was competent to stand trial, they waited until after he had been found guilty before taking their first step—or misstep, as we shall explain presently—toward arranging for expert witnesses who might have presented mitigating evidence on John Glenn's impaired brain function.

If the lawyers had done what they should have done, they would have been in a position to show the jury that John Glenn's family always considered him "slow;" that as early as the first grade he was assigned to a program for "educable mentally-retarded children;" that his school I.Q. tests repeatedly produced scores in the 60s; that a clinical psychological evaluation conducted a month before his 14th birthday reported a full scale I.Q. score of 56, placing him "within the Mental Defective range;" that another psychological evaluation conducted in this time frame described him as "an ineffectual and dependent young man" who "is very anxious and insecure;" that he left school virtually illiterate; that his mother beat him and his siblings regularly; and that he was hyperactive as a child, constantly butting his head against things and rocking his body back and forth when he went to sleep. Expert testimony adduced at the post-sentence hearing indicated that the hyperactivity was caused by a neurological impairment.

Dr. James Tanley, a neuropsychologist who examined John Glenn in connection with the post-sentence proceedings, found that Glenn was of borderline intelligence (Dr. Tanley reported a full scale I.Q. of 73), with evidence of brain damage. "There is no doubt in my mind but that there is something neurologically wrong with his brain," Dr. Tanley testified, "and that is going to have an effect on his behavior."

The brain damage was global in nature, according to Dr. Tanley, and might well have resulted from a surgical operation performed on Glenn's mother under general anesthesia early in her pregnancy. (Another expert witness who examined the pertinent hospital records also endorsed this hypothesis.)

Dr. Tanley expressed the view that John Glenn did not have the substantial capacity to conform his conduct to the requirements of the law. The doctor also opined that it was "extremely unlikely" that John Glenn himself would have been capable of thinking up the plan to break Robert Glenn free from custody; John's role in the scheme, according to Dr. Tanley, would have been that of a follower, not a leader.

A wealth of evidence was available to show that John Glenn had always been a follower, as opposed to a leader. His probation officer, for example, who supervised him for a period of 10 months when Glenn was 17, testified at the post-sentence hearing that Glenn was not able to keep up with his peers on the street, was "definitely a follower," and "didn't have enough going to be a leader."

Concerned about Glenn's inability to say no to his "negative peers," the probation officer once asked him if he would jump off the Mahoning Bridge (a high span over a river bed with more rocks than water) if his friends asked him to. Glenn said he would— an answer consistent with the probation officer's view that the boy sought and needed attention from his peers. Most of the attention that John Glenn did receive, the probation officer testified, came from his brother Robert.

The jurors, unfortunately for John Glenn, heard none of this. They did not hear that he had been classified in school as mentally retarded. They did not hear of his need for attention, or his susceptibility to the influence of his brother Robert. And they did not hear that he had a neurological impairment which probably stemmed from the general anesthesia administered to his mother months before he was born.

As we have indicated, however, the jurors were not without expert guidance of a sort. It is important to understand the arrangements under which this guidance was obtained.

Nine days before the sentencing hearing was scheduled to start, John Glenn's counsel asked the trial court for a medical examination of the defendant "pursuant to the provisions of 2929.024 of the Revised Code of Ohio." (Section 2929.024 provides that where experts are reasonably necessary for the proper representation of the defendant at an aggravated murder trial or at the sentencing hearing following such a trial, and the court determines that the defendant is indigent, "the court shall authorize the defendant's counsel to obtain the necessary ser-

vices" at government expense.[2]) Unable to identify any particular expert whose services he wished to obtain, Glenn's lawyer then asked for the appointment of someone who had not been involved in the earlier competency evaluation. The prosecutor suggested that the defense was asking the court to appoint its own psychologist or psychiatrist under an entirely different procedure, one authorized by Ohio Rev. Code §§ 2929.03(D)(1) and 2947.06. Defense counsel made the mistake of acquiescing in this suggestion, despite the fact that—as the trial court pointed out at the time—the jurors would necessarily receive copies of any court-appointed expert's reports. Under the statute that defense counsel had cited originally, by contrast, the preparation and disposition of any reports would have been within the control of the defense.

Dr. D.V. Ramani, a psychiatrist, and Dr. James W. Siddall, a psychologist, were appointed by the trial court to evaluate John Glenn under Ohio Rev.Code § 2947.06, the statute cited by the prosecution. The doctors were briefed by the prosecution, but not by the defense. Defense counsel had no communication with the doctors at all.

Dr. Siddall spoke with John Glenn at the jail and gave him some psychological tests. Dr. Siddall then prepared a report that explained his reasons for believing that Glenn was competent to stand trial—an issue that had long since been resolved—and went on to analyze the question of mitigating circumstances largely on the basis on how the crime had been portrayed in documents furnished by the prosecution.[3] The report then concluded with a sentence that seems questionable in several particulars, given what we know now, but would not have seemed ques-

---

**2.** It is clear that the services provided for by § 2929.024 are available to the indigent capital defendant "for his own purposes...." *State v. Esparza*, 39 Ohio St.3d 8, 9, 529 N.E.2d 192, 195 (1988). When the expert is retained under § 2929.04, the defendant can decide for himself whether he wants to put the expert's findings before the jury.

**3.** The pertinent passage reads as follows:
"Regarding the question of mitigating circumstances, it is not possible to determine a great deal from Mr. Glenn's self-report as he vehemently denies being involved. However, the circumstances of this case, as portrayed in the documents of investigation, do suggest that Mr. Glenn knew the victim of the offense was a law enforcement officer engaged in his duties at the time of the offense. Circumstances also suggest that it was his specific purpose to kill this officer, but it seems very doubtful that the victim induced or facilitated the offense. Similarly, there is no suggestion that Mr. Glenn was under unusual duress, coercion, or strong provocation, in fact, the circumstances do suggest that the crime was carefully planned and carried out."

tionable in light of what the jury knew then: "Psychological evaluation indicates that the offense was not the product of psychosis, mental retardation, organic brain disease, other mental illness, lack of education, unusual emotional pressure, or inadequate coping skills on the part of Mr. Glenn."

Dr. Ramani also saw John Glenn at the jail and prepared a report. Dr. Ramani's examination appears to have been a superficial one,[4] but the report's concluding sentence was, from the defense standpoint, simply devastating: "In summary, within reasonable medical certainty, I do not see any imtigating [sic] circumstances in this particualr [sic] individual."

Defense counsel asked the trial court to redact this sentence before sending the report to the jury, but the court refused to do so. This was probably an error on the court's part, in our view. The problem would never have arisen, however, if defense counsel had not settled for court-appointed experts whose reports were going to be given to the jury willy-nilly, rather than exercising the right to obtain defense experts under Ohio Rev.Code § 2929.024, the statute initially cited by counsel.[5]

Not only did the reports of Drs. Ramani and Siddall go into the jury room in unredacted form, they went to the jury without any suggestion at all that some of the conclusions in the reports were open to question. John Glenn had a statutory right to examine the authors of the reports under oath, see Ohio Rev.Code § 2947.06, but the doctors were never called to the stand. We can only assume that defense counsel, not having done their homework, were not prepared to interrogate Drs. Ramani and Siddall about the basis for the very damaging conclusions they stated.

Did any of this affect the reliability of the jury's decision? We think it did. Viewing the total picture, and considering both the nature of the material presented to the jury that should not have been and the nature of the material not presented to the jury that should have been, we cannot have much confidence in the jury's weighing of the factors relevant to the issue of whether John Glenn should be sentenced to death.

■ Under the *Strickland* test, the petitioner must show a "reasonable probability" that, but for his counsel's unprofessional errors, the result would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. The petitioner does not have to show that his counsel's deficient conduct "more likely than not altered the outcome in the case." *Id.* at 693, 104 S.Ct. at 2068. The "reasonable probability" of which *Strickland* speaks, rather, is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. The question, in other words, is whether counsel's errors were serious enough to deprive the petitioner of a proceeding the result of which was "reliable," *id.* at 687, 104 S.Ct. at 2064—"whether counsel's conduct so undermined the proper functioning of the adversarial system that the trial [a term that includes capital sentencing proceedings] cannot be relied on as having

---

4. The entire description of the examination reads as follows:

"On Examination: Patient was well dressed and groomed, reliable, pleasant, cooperative and open. He was in good contact, with no evidence of acute or overt psychosis. He was well oriented X3. His cognitive functions including remote and recent memory were intact. His judgment had been adequate to his life style, to the extent he worked in a body shop and was developing his boxing skills. He is somewhat retarded (Repoted [sic] IQ in 75 percentile), but this doesn't appear to be severe enough to impair his judgement or his capacity to manage his day very well."

5. The dissent poses the following rhetorical question:

"Assuming that the court had authorized the appointment of Drs. Ramani and Siddall under § 2929.024, and defense counsel did not like the conclusions of the two experts, what were [counsel] to do?"

The answer seems obvious: no competent defense lawyer would have offered in evidence reports as damaging to the defense as these were. But we are not prepared to assume that Drs. Ramani and Siddall would have been the experts retained by the defense under § 2929.024 if counsel had done their homework ahead of time and had asked for authorization to hire someone like Dr. Tanley, for example. And defense counsel should obviously have worked closely with anyone retained as a defense expert to insure that the expert was fully aware of all facts that might be helpful to the defendant.

produced a just result." *Id.* at 686, 104 S.Ct. at 2064.

John Glenn's sentencing proceeding can hardly be relied upon as having produced a just result when the jurors were given to understand, in the unchallenged report of Dr. Siddall, that the crime was not the product of mental retardation or organic brain disease.[6] "It is clear that mental retardation has long been regarded as a factor that may diminish an individual's culpability for a criminal act." *Penry v. Lynaugh,* 492 U.S. 302, 337, 109 S.Ct. 2934, 2956, 106 L.Ed.2d 256 (1989). Judge Easterbrook, concurring in the affirmance of a grant of habeas relief to a retarded petitioner who had apparently suffered brain damage as a result of blows to the head in his youth, has cited empirical evidence suggesting that while juries tend to distrust claims of insanity, they are more likely to react sympathetically when their attention is drawn to organic brain problems such as mental retardation. *Brewer v. Aiken,* 935 F.2d 850, 861–62 (7th Cir.1991) (Easterbrook, J., concurring). The failure of John Glenn's counsel to draw the jury's attention to the organic brain problem here, and to the possibility that it helped turn John Glenn into putty in the hands of his admired older brother, was both objectively unreasonable and prejudicial.

Our sister circuits have had no difficulty in finding prejudice in sentencing proceedings where counsel failed to present pertinent evidence of mental history and mental capacity. In addition to *Brewer v. Aiken,* see, *e.g., Stephens v. Kemp,* 846 F.2d 642, 652–55 (11th Cir.), *cert. denied,* 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988) ("the resulting prejudice is clear"); *Blanco v. Singletary,* 943 F.2d at 1505 (prejudice requirement "clearly met" by counsel's failure to present evidence of epileptic seizures and organic brain damage); *Loyd v. Whitley,* 977 F.2d 149, 159–60 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2343, 124 L.Ed.2d 253 (1993) (failure to present mitigating evidence of substantial mental defects "undermines our confidence in the outcome").

We would be badly out of step with the other circuits were we to conclude that there was *no prejudice in the case at bar.*

Even if we merely had "grave doubt" as to the existence of prejudice, the Supreme Court's recent holding in *O'Neal v. McAninch,* —— U.S. ——, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995), would require us to reverse the denial of habeas relief here. But it is "unusual" for judges to be in such doubt, *id.* at ——, 115 S.Ct. at 994, and that is not the situation in which we find ourselves; under the *Strickland* standard, we think the prejudice in this case is quite clear.

### III

In addition to challenging his sentence, Glenn contends that both the proceedings in which the jury found him guilty and those in which the appellate courts affirmed the conviction were tainted by error of constitutional dimension. He argues that as an African American he was denied his right to trial by a fairly representative jury when venue was changed from Mahoning County, which has a substantial minority population, to Portage County, which does not; that there were multiple errors at trial, the cumulative effect of which was to make the trial fundamentally unfair; and that he was denied effective assistance of counsel on his direct appeals as of right in the Ohio courts. We reject all of these contentions, in part for reasons ably stated by the district court.

The judgment of the district court is **AFFIRMED** insofar as the denial of habeas relief was predicated upon the conclusion that Glenn's conviction and its affirmance on appeal were not unconstitutional. The judgment is **REVERSED** insofar as the sentence of death is concerned, and the case is **REMANDED** with instructions to issue the writ of habeas corpus, subject to the state's imposing a new sentence within a reasonable period of time.

---

**6.** Dr. Ramani did acknowledge that Glenn was "somewhat retarded," but neither Dr. Ramani nor the jury had seen Glenn's full psychological record—and the acknowledgment of some degree of mental retardation was vitiated when Dr. Ramani invaded the province of the jury by expressing the "medical" opinion that there were no mitigating circumstances.

SILER, Circuit Judge, concurring in part and dissenting in part.

I concur with Part III of the majority opinion which affirmed the trial portion of Glenn's conviction, but I respectfully dissent from the majority's conclusion in Part II, that Glenn was denied the effective assistance of counsel in the sentencing phase of his conviction. Therefore, I would affirm the district court's denial of the writ of habeas corpus.

As the majority describes, both the Ohio Court of Appeals and the United States District Court found no prejudice from the performance of defense counsel at the sentencing hearing, under the test from *Strickland v. Washington,* 466 U.S. 668, 686–87, 104 S.Ct. 2052, 2063–64, 80 L.Ed.2d 674 (1984). However, the majority finds that the paucity of evidence introduced for Glenn in his sentencing trial failed to show certain factors outlined in Ohio Rev.Code § 2929.04(B): (1) "the history, character and background of the offender"; (2) whether "the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirement of the law"; and (3) "[a]ny other factors that are relevant to the issue of whether [Glenn] should be put to death." I respectfully disagree with that conclusion. Certainly, in hindsight, one can find experts and other witnesses who might have helped Glenn. Whether they could have helped him any better than the ones that were available is pure speculation.

Defense counsel had the videotape prepared for the sentencing phase of the trial. That showed foresight on his part. The majority suggests that counsel should have obtained an advance ruling on its admissibility, but whether the trial court would have made a preliminary ruling is again speculation, as some judges are reluctant to rule prospectively on evidentiary matters. There was at least some argument in favor of the videotape's admissibility, for the Ohio Court of Appeals on direct appeal discussed it and then found the failure to admit it into evidence was harmless error at best. The Ohio Supreme Court agreed, because, "those particular matters applicable to mitigation which were presented in the videotape were substantially included in the trial testimony of other defense witnesses." *State v. Glenn,* 28 Ohio St.3d 451, 504 N.E.2d 701, 709 (1986), *cert. denied,* 482 U.S. 931, 107 S.Ct. 3219, 96 L.Ed.2d 705 (1987). Therefore, the failure to call Glenn's mother and the employer as witnesses was of little import to the Ohio Supreme Court, as their testimony would have been cumulative.

What was presented for Glenn in the sentencing phase of the trial? The jury had the reports from Drs. Ramani and Siddall, the presentence report, and testimony from a minister, a teacher and a lawyer. They also had the unsworn statement by Glenn.

As the Ohio Supreme Court found, many of the aggravating and mitigating factors in Ohio Rev.Code § 2929.04(B) were not pertinent to this case. Of those factors which were pertinent, the jury knew the circumstances of the offense and the history, character and background of Glenn. Even though the information pertained to his earlier life, there was no evidence to suggest any significant changes in his later life. After all, he was only nineteen years old at the time of the offense. The Ohio Supreme Court found that:

Appellant also introduced evidence as to his poor environment and background. Appellant was raised in an environment of poverty. He received little attention from his natural father. He had been truant and had educational and disciplinary problems as a boy. Appellant had extensive contact with his church when he was younger. He also required special education classes.

*Glenn,* 504 N.E.2d at 711.

Although the majority is concerned with the fact that defense counsel had not spoken to any of Glenn's brothers and sisters, nor examined his medical records or mental health counseling records, nor talked to his probation officer, nor examined the probation officer's records, it appears that most of the information they would have garnered from those sources would only have corroborated the information presented to the jury in the reports of Drs. Ramani and Siddall and in

the presentence report. The jury had information that Glenn came from a poor environment, was retarded and was in special education classes. Moreover, had counsel called the defendant's mother and siblings, their testimony may have been detrimental to Glenn's case. For instance, Glenn claims that his mother beat him and the siblings regularly, but she probably would not have admitted that in her testimony. Perhaps her children would have testified about the beatings, but the post-conviction decision by the Ohio Court of Appeals indicates that the family members had signed affidavits containing negative information about Glenn.

Dr. Tanley, the neuropsychiatrist who examined Glenn in the post-sentence proceedings, corroborated the I.Q. finding from Ramani's report. Dr. Ramani also reported that Glenn used to hit his head against the wall and was "nervous." The theory expounded by Dr. Tanley and another expert, referred to in the majority opinion, that Glenn's brain damage might have resulted from a surgical procedure performed on Glenn's mother when she was under general anesthesia in her pregnancy seems also to be speculative. There is no physician yet who has stated that it was within reasonable medical certainty that such a surgical procedure on the mother caused any permanent problems to Glenn.

I do not understand how the evidence of brain damage is more mitigating than the fact that Glenn was retarded. Dr. Siddall concluded that the offense was not the product of retardation or any brain disease or other mental illness. Certainly, Dr. Tanley had a contrary view. The requirements of *Strickland* do not mandate that an attorney search out all potential favorable psychiatrists and psychologists, in order to find the one who would testify best for his client.

I do not think that it is significant that defense counsel first asked the court for a medical examination of the defendant under Ohio Rev.Code § 2929.024, but the experts were later appointed under Ohio Rev.Code §§ 2929.03(D)(1) and 2947.06. Section

2929.024 is a statute providing for expert services for indigents in general and applies to pre-trial, trial and post-trial services. However, § 2929.03(D)(1) "applies to all capital defendants, whether indigent or not." *State v. Esparza,* 39 Ohio St.3d 8, 529 N.E.2d 192, 195 (1988), *cert. denied,* 490 U.S. 1012, 109 S.Ct. 1657, 104 L.Ed.2d 171 (1989). Once the defendant chooses to undergo the mental examinations, he risks the jury's knowledge of the conclusions of the experts under § 2947.06 in a death case. *Id.* "There is no constitutional infirmity in providing the defendant with such an option." *State v. Buell,* 22 Ohio St.3d 124, 489 N.E.2d 795, 808 (1986). Assuming that the court had authorized the appointment of Drs. Ramani and Siddall under § 2929.024, and defense counsel did not like the conclusions of the two experts, what were they to do? Would they ask the court to authorize two others?[1] Or would they have been forced to have put into evidence what the experts had said? Had they decided against using the experts opinions at all, and the defendant would have been sentenced to death, we would be in the same position here, with Glenn on appeal asserting ineffective assistance of counsel because appointed counsel at trial failed to introduce into evidence the expert reports of Drs. Ramani and Siddall.

In the record are found two pretrial evaluations from Dr. Harvey Kayne, a clinical psychologist, and Dr. Anil Nalluri, a psychiatrist, concerning a possible insanity defense and Glenn's competency to stand trial. Neither of these reports was presented to the jury in mitigation during the sentencing phase of the trial. Yet they probably could have been introduced by defense counsel, and they would have corroborated the reports of Drs. Ramani and Siddall. Had they been read to the jury in the sentencing phase, present counsel no doubt would have asserted ineffective assistance of counsel, as the reports indicate that Glenn was competent to stand trial and did not suffer from a mental illness, although he had "borderline intellectual functioning."

---

1. The trial court would have likely denied the request. *See Esparza,* 529 N.E.2d at 195 ("Appellant was not entitled to a 'rebuttal' ... mental examination prepared by a second psychologist or psychiatrist of his own choosing also at state expense.").

I find no prejudice here. It does not appear to me that there were any material mitigating factors that were not introduced, except through experts who had been found after the trial who would have testified favorably for the defense. I do not have grave doubt concerning prejudice under *O'Neal v. McAninch,* —— U.S. ——, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995), so I would affirm.