NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0674n.06

Case No. 13-3114

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 28, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MICHAEL GOZA, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| ROBERT WELCH, | ) | OHIO |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE: SILER, GILMAN, and GIBBONS, Circuit Judges.

SILER, Circuit Judge. After the district court denied Michael Goza's petition for a writ of habeas corpus, we granted a certificate of appealability (COA) for his claim of ineffective assistance of counsel for failing to present evidence that one of the victims initially identified another person as her attacker. Goza claims that the court erroneously decided that counsel's deficient performance was not sufficiently prejudicial to justify issuance of a writ. We AFFIRM.

## BACKGROUND[1]

Early in the morning on March 26, 2006, nine-year-old C.A. awoke on her top bunk bed to find that her pants and underwear had been removed. She saw a man in her bed with his hands on his zipper in preparation for removing his pants. C.A. resisted, telling him to leave and kicking him off her. Finally, he determined to leave, but warned, "If you tell anyone, I'll hurt you." He then climbed out of the bed and walked out the door. C.A. checked on her three-year-old sister, K.J., lying on the bottom bunk, who remained asleep. Five to ten minutes later, C.A. climbed the stairs to her parents' room to report the incident.

Robert Jarvis, father of K.J. and stepfather of C.A., called the police. While C.A. explained to her mother, Coral Jarvis, what happened, Robert checked the house. He found K.J. asleep in her first floor bedroom. Although she was not home that night, he then checked his 16-year-old stepdaughter T.A.'s room, located next to C.A. and K.J.'s room. T.A. had two windows in her room, one on the side of the house and one on the back of the house. Her bed was positioned underneath the back window, so that if someone climbed into her room through the back window, he or she would land on her bed. Robert noted that the side window screen was open about a quarter of the way, the back window screen was completely ajar, and both windows were unlocked.

Police arrived almost immediately after Robert's call. C.A. described the attacker to the police: he wore a cap, a dark sweatshirt and jeans; she noted that he was white. Fairview Hospital is located directly across the street from the Jarvis home. Police called the hospital to

---

[1] The Ohio Court of Appeals opinion denying Goza's direct appeal presented most of these facts, which are presumed to be correct unless Goza rebuts them by clear and convincing evidence. 28 U.S.C. § 2254; *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998). Goza has not argued or presented evidence to show that any of these facts are incorrect. Facts discussed in this opinion that are not contained within the Ohio Court of Appeals' decision reflect trial testimony.

see if anyone with characteristics similar to C.A.'s description had visited the hospital. Fairview Hospital reported that Robert Givens had recently checked in and loosely matched the description. Police brought Givens to the Jarvis house, and C.A. identified him as the attacker, although she admitted that she did not observe the perpetrator's face. However, police quickly learned that Givens had been at a CVS pharmacy around the time of the incident in question and eliminated him as a suspect.

When K.J. awoke, she said to her father, "Daddy, you hurt my vagina last night, don't do that again." Robert reported this accusation to the police and then took K.J. to the emergency room. She told the nurse at the hospital that her father hurt her vagina and put his fingers in her panties. The nurse released K.J. to her parents despite the child's accusations against the father, because the interaction between Robert and K.J. gave no indication that her father committed the attack.

A social worker, Lawrence Petrus, interviewed the two victims. The story C.A. related to Petrus was consistent with what she told her parents and the nurse. Petrus testified that K.J. informed him that there had been "a bad man in her room" who "asked her to hold his penis," and when she refused, "pressed his finger against her vagina." Even though he was aware of K.J.'s allegation against her father, Petrus gathered no information from the interview substantiating the accusation.

Testimony from trial conflicts as to how Goza became a suspect, but at some point authorities became aware of the relationship between T.A. and Goza. They had socialized on two occasions. Goza lived just across the street and called T.A. occasionally.

T.A. was not at home on March 26, 2006, because she was being treated for drug abuse. When Detective James McPike interviewed T.A. at her drug treatment facility, T.A. informed

him that she had experienced a similar nighttime attack weeks before. At trial, T.A. testified to the following: on March 11, 2006, she was sleeping at home when she awoke around 2:00 a.m. to find Goza on her bed. When she asked him how he got into her room, he explained he had entered through her window. He then began rubbing her stomach, legs, and chest. He told her he loved her, that she should be his girl, and that he had been coming to her window at night for the past couple of weeks to see if she would be there. She asked him to leave and led him out of her room and through the front door. When she returned to her room, she noted that the side window was open a few inches, while the back window over her bed remained closed. She testified that Goza must have entered through the side window, because if he had entered through the back window, she would have been awakened by his entry onto her bed.

During the investigation into the March 26 incident, police lifted five fingerprints from T.A.'s back window—the one positioned above her bed.[2] They compared Goza's fingerprints to those lifted and found an exact match on one. The police did not identify the other four fingerprints. On April 11, Detective McPike brought a six-man photo array to the Jarvis house. Within seconds, C.A. identified Goza as her attacker, saying, "He looked just like him."

Goza was charged with two counts of aggravated burglary, two counts of kidnapping, one count of rape, one count of attempted rape, and one count of gross sexual imposition arising from the March encounters. He was also charged with burglary from the March 11 incident. During trial, C.A. identified Goza as the man who attacked her. Goza's fiancée, Sheari Conner, testified that Goza was at home, sleeping with her from 2:30 a.m. through the night in question. She

---

[2] The prosecution argued that Goza did not leave the fingerprints the night he attacked T.A. According to T.A.'s testimony, Goza's purported point of entry on March 11 was the side window and point of exit was through the front door. The suspected point of entry for the March 26 incident is the back window, a theory consistent with evidence presented at trial that Robert saw the back window completely ajar and felt a dampness on the bed and carpet when investigating T.A.'s room on the morning in question.

would have known if he left the bed, because he would have had to crawl over her to do so. Her car blocked his, so he could not drive to the Jarvis home, and he had an unspecified disability that prevented him from walking to the Jarvis house. The jury found Goza guilty on all charges except rape, and the court sentenced him to 31 years' imprisonment.

Goza appealed his conviction to the Ohio Court of Appeals, which affirmed the judgment entered against Goza. The Ohio Supreme Court denied leave to appeal and dismissed the appeal. Next, Goza petitioned the state trial court for post-conviction relief. The trial court dismissed the petition on res judicata grounds. Goza appealed that ruling to the state court of appeals, which determined that the trial court's judgment on res judicata grounds was erroneous, but denied relief to Goza. The court of appeals neglected to discuss the ineffective assistance of counsel claim pertaining to counsel's failure to investigate, develop, and present evidence of C.A.'s initial identification of Givens. Goza appealed the decision to the Ohio Supreme Court, which again declined review.

Having thus exhausted his state court remedies, Goza filed a petition for a writ of habeas corpus in the Northern District of Ohio. He presented numerous claims of error, including the present issue before us—ineffective assistance of counsel. The district court found no prejudice and denied the petition.

## STANDARD OF REVIEW

"The standard for review of a denial of a petition of habeas corpus is *de novo*." *Bannerman v. Snyder*, 325 F.3d 722, 723 (6th Cir. 2003). Ordinarily, when the state court reaches the merits of an ineffective assistance of counsel claim, we employ another layer of review under the deferential standard set forth in § 2254(d) of the Antiterrorism and Effective Death Penalty Act of 1996. *English v. Romanowski*, 602 F.3d 714, 725 (6th Cir. 2010).

However, "when a claim has not been adjudicated on the merits in State court proceedings, and has not been procedurally defaulted, we look at the claim de novo rather than through the deferential lens of AEDPA." *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005) (internal quotation marks and citations omitted). Accordingly, we apply *de novo* review.

## DISCUSSION

The sole issue for review is whether Goza's trial counsel performed ineffectively for failing to argue or present evidence that C.A. first identified another man as the individual who attacked her. In *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the Supreme Court established a two-part test for determining ineffective assistance of counsel: deficient performance and prejudice to the defendant. As explained below, Goza has perhaps shown that his trial counsel's performance was deficient, but has failed to demonstrate that the deficient performance prejudiced his defense.

### A. Counsel's Deficient Performance

The Supreme Court explained that

> [t]o establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance.

*Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S. at 688). Courts must apply the *Strickland* standard with "scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve." *Id.* at 788 (quoting *Strickland*, 466 U.S. at 689-90). Accordingly, "[j]udicial scrutiny of counsel's performance must be highly deferential. . . . [I]t is all too easy for a court, examining counsel's

defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.

Despite this "high bar," *see Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), the district court found deficient performance. If trial counsel failed to understand that C.A.'s initial identification of another man as her attacker was exculpatory, his conduct likely fell outside the wide range of reasonable professional conduct under *Strickland*, 466 U.S. at 688. However, it must also have been prejudicial to Goza.

**B. Counsel's Deficient Performance Did Not Prejudice the Defendant**

To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Strickland*, 466 U.S. at 694. "The petitioner does not have to show that his counsel's deficient conduct more likely than not altered the outcome in the case." *Glenn v. Tate*, 71 F.3d 1204, 1210 (6th Cir. 1995). Rather, "[t]he question . . . is whether counsel's errors were serious enough to deprive the petitioner of a proceeding the result of which was reliable . . . [,] having produced a just result." *Id.* at 1210-11 (internal quotations and citation omitted).

Goza is correct that the prior identification could challenge C.A.'s reliability to some extent. However, this is offset by a number of factors. First, the State would have presented evidence to undercut the strength of the stand-up identification of Givens. This identification occurred in a suggestive context: the man matched the description she provided, and the police presented him to her on the day of the event, amid the stress and commotion of dealing with law enforcement and hospital visits. Moreover, during the trial, defense counsel did question witnesses about Givens as an early suspect. Although Goza now refutes this conclusion,

evidence shows that C.A. misidentified Givens. The jury was aware that the police had eliminated Givens as a suspect; they had found a receipt in his car indicating he was at a distant CVS pharmacy minutes before C.A.'s parents received her report of the intruder. Evidence suggests that Givens spent the evening of March 26 pill-shopping, which explains his presence at Fairview Hospital.

Second, C.A.'s identification of Goza in the photo array remains persuasive. It occurred in a calmer environment, far from the heat of the moment. McPike described the photo identification as follows: He conducted the lineup in C.A.'s dining room. He "made a photo lineup with six similar-looking males on it. Michael Goza was among those males." When he presented C.A. the lineup, McPike "could see her eyes moving back and forth. When she got to No. 5[, Goza,] her eyes stopped and she pointed and said he looked just like him." She identified him "within seconds." C.A. testified that she had never seen Goza before the photo array, or since, and that even though she never fully saw her assailant's face, she knew "he just look[ed] like the guy that was in [her] room." This identification was quick, unequivocal, and substantiated by her subsequent identification of Goza during trial.

Finally, C.A.'s initial identification does nothing to weaken the other damaging evidence, which cumulatively supports the conviction. When evaluating prejudice, the panel must take "into account the totality of the circumstances, as well as the relative strength of the case proffered by the prosecution." *Campbell v. Coyle*, 260 F.3d 531, 551 (6th Cir. 2001). T.A. reported that weeks earlier, she encountered an unwanted, nighttime sexual advance in a strikingly similar manner. Goza entered her room through the window, knelt over her while she slept, and engaged in sexual contact with her—analogous to the culprit's actions in this case.

Her report to McPike led detectives to Goza, enabled them to match his fingerprints to those lifted from her window, and provided the justification for C.A.'s photo identification.

Considering the strength of T.A.'s testimony, the matching fingerprints, C.A.'s quick identification of Goza both in the photo array and at trial, and the elimination of Givens as a suspect, sufficient evidence supported the jury's finding. If trial counsel had added C.A.'s identification of Givens to the evidence at trial, then at most the jury would have questioned C.A.'s identifications of Goza. The other evidence sufficiently supports the verdict.

This case is considerably different from any case Goza cites in support of his prejudice arguments. In *Foster v. Wolfenbarger*, 687 F.3d 702 (6th Cir. 2012), the defendant's friend wrote a letter to and later spoke with defense counsel, explaining that the defendant had been with him during the time he supposedly committed the crime in question. *Id.* at 705. Even though defense counsel's principal strategy at trial was mistaken identification, counsel did not introduce the alibi witness. *Id.* The state court noted that this evidence could "possibly get the record" for deficient performance, and the district court agreed. *Id.* at 709-10. On appeal, we held that the weakness of the state's case compared to the strength of the potential alibi defense created a reasonable probability of a different outcome. *Id.* at 710. This is a paradigmatic example of when the rare issuance of a writ of habeas corpus is appropriate: where the evidence omitted is strong, the evidence in favor of guilt is comparably weak, and the balance between the two suggests the trial outcome is specious. Here, the balance tips in the other direction. C.A.'s initial identification is subject to much criticism, and the evidence against Goza is substantial enough to offset any effect the introduction of C.A.'s identification of Givens may have on the jury's deliberations.

In failing to present evidence that the principal eyewitness initially identified another person as her attacker, trial counsel's performance likely did not meet the standards of professional acumen required. Nevertheless, we AFFIRM the district court's denial of the petition for a writ of habeas corpus because trial counsel's error does not undermine confidence in the jury's verdict.