*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0457P (6th Cir.)
File Name: 03a0457p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

───────────────

DAVID HAMBLIN,
    *Petitioner-Appellant,*

    *v.*        No. 00-3663

BETTY MITCHELL, Warden,
    *Respondent-Appellee.*

───────────────

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 95-02046—Peter C. Economus, District Judge.

Argued: March 20, 2002

Decided and Filed: December 29, 2003

Before: MERRITT, BATCHELDER, and GILMAN,
Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:** Linda E. Prucha, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Matthew C. Hellman, ATTORNEY GENERAL'S OFFICE OF OHIO, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellee. **ON BRIEF:** Linda E. Prucha, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, George C. Pappas,

Akron, Ohio, for Appellant. Matthew C. Hellman, ATTORNEY GENERAL'S OFFICE OF OHIO, CAPITAL CRIMES SECTION, Columbus, Ohio, Michael L. Collyer, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Cleveland, Ohio, for Appellee.

MERRITT, J., delivered the opinion of the court, in which GILMAN, J., joined. BATCHELDER, J. (pp. 23-24), delivered a separate dissenting opinion.

───────────────

**OPINION**

───────────────

MERRITT, Circuit Judge. In this death penalty case from Ohio tried in the state criminal court in Cleveland, the primary issue is whether counsel for the defendant provided an adequate defense under the Sixth Amendment as incorporated in the Due Process Clause. Fred Jurek was counsel for the defendant, Hamblin, the petitioner in this habeas corpus case. Jurek had no experience trying capital cases, and he was later disbarred from the practice of law in Ohio. After the defendant was found guilty of murder by a jury at the guilt phase of the case, Jurek did not prepare for the penalty phase of the bifurcated trial. He did not try to find out any family history or any facts concerning defendant's psychological background and mental illness, nor did counsel seek any advice or expert consultation for the penalty phase of the case. Despite a large body of mitigating evidence, counsel did nothing to discover what was available or introduce it in evidence. We will first set out the standards governing the assistance of defense counsel in capital cases at

the sentencing phase of the case and then apply those standards to the facts of this case.[1]

## I.

Ineffective assistance of counsel in capital cases has been a persistent problem in the United States. *See* James S. Liebman, *The Overproduction of Death*, 100 COLUM. L.REV. 2030, 2102-10 (2000). It was only 70 years ago in the notorious but seminal Scottsboro Boys case, *Powell v. Alabama*, 287 U.S. 45 (1932), that the Supreme Court finally decided that the Due Process Clause of the Fourteenth Amendment requires the appointment of competent counsel capable of "the giving of effective aid in the preparation and trial" because a defendant facing capital punishment "requires the guiding hand of counsel at every step in the proceeding against him." 287 U.S. at 69-71.

Not until 50 years later in *Strickland v. Washington*, 466 U.S. 668 (1984), did the court begin to define specifically what the "effective assistance of counsel" means. There the Court said that counsel in such cases must act with "reasonableness under prevailing professional norms" as "guided" by "American Bar Association standards and the like." This standard includes counsel's "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." But the Court went on to say that under this standard "judicial scrutiny of counsel's performance must be highly deferential," and that the defendant must overcome "a strong presumption" that counsel's action is reasonable because any "detailed guidelines . . . would encourage the proliferation of ineffectiveness challenges."

---

[1] The petition before us was filed before the effective date of AEDPA (April 24, 1996), see *Lindh v. Murphy*, 521 U.S. 320 (1997), and is governed by preexisting standards.

In the most recent case on ineffective assistance, *Wiggins v. Smith*, 123 S. Ct. 2527, decided June 26, 2003, the Court held by a 7-2 vote that counsel's investigation and presentation "fell short of the standards for capital defense work articulated by the American Bar Association . . . standards to which we have long referred as 'guides to determining what is reasonable.'" 123 S. Ct. at 2536-37. In its discussion of the 1989 ABA Guidelines for counsel in capital cases, the Court held that the Guidelines set the applicable standards of performance for counsel:

> [I]nvestigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989).... Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.

*Id.* at 2537 (emphasis in original). The Court then also adopted ABA guideline 11.8.6, which it described as stating

> that among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences.

*Id*. (Emphasis in original.) Thus, the *Wiggins* case now stands for the proposition that the ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the "prevailing professional norms" in ineffective assistance cases. This principle adds clarity, detail and content to the more generalized and indefinite 20-year-old language of *Strickland* quoted above.

Prior to the *Wiggins* case, our Court in a series of cases had dealt with the failure of counsel to investigate fully and present mitigating evidence at the penalty phase of the case. Our analysis of counsel's obligations matches the standards of the 1989 Guidelines quoted by the Supreme Court in *Wiggins*. In *Glenn v. Tate*, 71 F.3d 1204, 1206-08 (6th Cir. 1995), Judge Nelson for himself and Judge Guy (Judge Siler dissenting) set aside the death verdict on grounds of ineffective assistance of counsel at the penalty phase. The Court held that counsel must perform a full and complete investigation of mitigating evidence including the defendant's "history, background and organic brain damage." 71 F.3d at 1207. The Court also held that this investigation should be conducted before the guilt phase of the case. It said that the "time consuming task of assembling mitigating witnesses [should not wait] until after the jury's verdict ...." *Id.* (quoting *Blanco v. Singletary*, 943 F.2d 1477, 1501-02 (11th Cir. 1991)). The Court faulted the lawyers because they "made no systematic effort to acquaint themselves with their client's social history" — for example, they "never spoke to any of his numerous brothers and sisters," and "never examined school records" or "medical records" or "records of mental health counseling." *Id.* at 1208. In a similar case, *Austin v. Bell*, 126 F.3d 843, 847-48 (6th Cir. 1997), Judge Suhrheinrich, for a panel including Judges Martin and Merritt, relied on Judge Nelson's opinion in *Glenn v. Tate* to explain that prevailing standards require a full and complete investigation of mitigating evidence. Then in *Coleman v. Mitchell*, 268 F.3d 417, 449-52 (6th Cir. 2001), Judge Clay for himself and Judge Cole (Judge Batchelder dissenting), reviewed the holdings of *Glenn* and *Austin* and reached a similar conclusion. Like the Supreme Court in *Wiggins*, Judge Clay explicitly relied on the 1989 ABA Guidelines.

The 1989 Guidelines adopted as "prevailing norms" in *Wiggins* reinforce and support our court's previous rulings in *Glenn*, *Austin* and *Coleman* applying similar norms to cases tried in the 1980's. Although the instant case was tried before the 1989 ABA edition of the standards was published, the

standards merely represent a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases. The ABA standards are not aspirational in the sense that they represent norms newly discovered after *Strickland*. They are the same type of longstanding norms referred to in *Strickland* in 1984 as "prevailing professional norms" as "guided" by "American Bar Association standards and the like." We see no reason to apply to counsel's performance here standards different from those adopted by the Supreme Court in *Wiggins* and consistently followed by our court in the past. The Court in *Wiggins* clearly holds at 123 S. Ct. at 2535, that it is not making "new law" on the ineffective assistance of counsel either in *Wiggins* or in the earlier case on which it relied for its standards, *Williams v. Taylor*, 529 U.S. 362 (2000).

New ABA Guidelines adopted in 2003 simply explain in greater detail than the 1989 Guidelines the obligations of counsel to investigate mitigating evidence. The 2003 ABA Guidelines do not depart in principle or concept from *Strickland*, *Wiggins* or our court's previous cases concerning counsel's obligation to investigate mitigation circumstances.[2]

---

[2]The 2003 ABA Guidelines at section 10.7 contain ten pages of discussion about counsel's "obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." The description of counsel's obligation to investigate mitigating evidence for the sentencing phase of the case is as follows (omitting quotation marks and the lengthy footnotes attached to the test):

> Counsel's duty to investigate and present mitigating evidence is now well established. The duty to investigate exists regardless of the expressed desires of a client. Nor may counsel sit idly by, thinking that investigation would be futile. Counsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions unless counsel has first conducted a thorough investigation with respect to both phases of the case.

> Because the sentences in a capital case must consider in

mitigation, anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant, penalty phase preparation requires extensive and genearlly unparalleled investigation into personal and family history. In the case of the client, this begins with the moment of conception [*i.e.*, undertaking representation of the capital defendant]. Counsel needs to explore:

(1) Medical history, (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage).

(2) Family and social history, (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (*e.g.*, failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

(3) Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities;

(4) Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);

(5) Employment and training history (including skills and performance, and barriers to employability);

(6) Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services);

The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defense (*e.g.*, by suggesting additional areas for questioning

In sum, we recognize that we must measure counsel's performance in this case against the prevailing standards at the time of Hamblin's trial. We cite the 1989 and 2003 ABA Guidelines simply because they are the clearest exposition of counsel's duties at the penalty phase of a capital case, duties that were recognized by this court as applicable to the 1982 trial of the defendant in *Glenn v. Tate*, 71 F.3d 1204, 1206-08 (6th Cir. 1995). Since that trial took place even before the trial in the present case, the same standards regarding counsel's duty to investigate mitigating evidence, as articulated in the ABA Guidelines, are relevant here.

police officers or other witnesses), decisions about the need for expert evaluation (including competency, mental retardation, or insanity), motion practice, and plea negotiations.

....

It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others. Records — from courts, government agencies, the military, employers, etc. — can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witnesses' recollections. Records should be requested concerning not only the client, but also his parents, grandparents, siblings, and children. A multi-generational investigation frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment. The collection of corroborating information from multiple sources — a time-consuming task — is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence.

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ¶ 10.7 (2003) at pp. 80-83.

## II.

### A.

This case begins in 1983 in Cleveland, Ohio, when Metropolitan Park Ranger John English was investigating alleged homosexual activity in a local park. He was shot in the leg by an unknown assailant. His injuries were not life threatening. Just prior to the shooting, Ranger English and other witnesses observed petitioner David Hamblin sitting in his car at the park. Twenty minutes after the shooting, Lillian Merrick was found unconscious in her car in the parking lot of a store near the park, suffering from a blow to the head inflicted by a blunt object. She also sustained a wound to her hand, described as a "defensive" wound. She had been robbed of her purse and groceries. She died three days later from her injuries without regaining consciousness. Investigation clearly established that defendant Hamblin wounded the park ranger and killed Lillian Merrick.

A jury in the Common Pleas Court of Cuyahoga County convicted Hamblin of aggravated murder, aggravated robbery, attempted murder and having a weapon under disability and sentenced him to death. The conviction was affirmed by the Cuyahoga County Court of Appeals and the Ohio Supreme Court. *State v. Hamblin*, No. 49975, 1986 WL 11132 (Ohio App. Sept. 18, 1986), *aff'd*, 37 Ohio St. 3d 153, 524 N.E.2d 476, *cert. denied*, 488 U.S. 975 (1988).

Hamblin filed a petition pursuant to 28 U.S.C. § 2254 in November 1995 after exhausting his state post-conviction proceedings. *State v. Hamblin*, No. 66556, 1994 WL 706137 (Ohio App. Dec. 15, 1994), *dismissed, appeal not allowed*, 72 Ohio St. 3d 1528, 649 N.E.2d 837 (May 31, 1995). Hamblin filed his petition for habeas review prior to the enactment of the Antiterrorism and Effective Death Penalty Act, which permits reviewing federal courts greater latitude in examining the proceedings than is permissible under AEDPA-governed cases. *See Williams v. Taylor*, 529 U.S. 362 (2000) (applying

the stricter AEDPA standard to petitions filed after April 24, 1996); *Lindh v. Murphy*, 521 U.S. 320 (1997).

The district court denied Hamblin's request for a writ of habeas corpus, for an evidentiary hearing and for discovery. On the basis of the papers before the court, it held that counsel was not ineffective and labeled the lack of investigation as "strategic," finding that counsel relied on the now defunct "residual doubt" theory during the penalty phase. The residual doubt theory seeks to convince the jury to impose a less severe sentence by reinforcing any lingering doubt the jury may have about the guilt of the defendant. "Residual doubt" was rejected by the Ohio Supreme Court as a mitigation strategy after Hamblin's trial. *State v. McGuire*, 80 Ohio St. 3d 390, 686 N.E.2d 1112, 1123 (1997). *McGuire* held that because the jury must find guilt at the culpability phase beyond a reasonable doubt, a "residual doubt" theory makes no sense. If the jury has "residual doubt," it must not convict. Therefore, residual doubt can no longer be used as a mitigating factor in Ohio at sentencing.

### B.

The record reveals that defense counsel's representation of Hamblin at the penalty stage of the case fell far short of prevailing standards of effective assistance of counsel as outlined in *Wiggins*, our previous cases and the 1989 and 2003 ABA Guidelines.

The Cuyahoga County Court of Common Pleas appointed Fred Jurek and Arthur Lambros to serve as Hamblin's court-appointed attorneys. Neither lawyer had previously tried a capital case. Jurek[3] admitted in his affidavit that he did

---

[3] Only Jurek filed an affidavit for the state post-conviction proceeding. Jurek was disbarred in 1989 and died in 1999. There is no information in the record as to why Hamblin's other attorney, Arthur Lambros, did not submit an affidavit during the post-conviction proceedings. Because Jurek was the only defense lawyer to speak during

essentially nothing by way of preparation for the penalty phase of this trial. Aff. of Fred Jurek, at ¶ 8, *State v. Hamblin*, CR-186558, Ex. B. to State Post-Conviction Petition (Ohio App. July 31, 1989). Jurek stated in his affidavit that he did not treat Hamblin's case any differently than other criminal cases he had handled and he was "unaware" of the special preparation that was needed for the penalty phase. *Id*. at ¶ 12. He stated he did not prepare for the penalty phase until after the guilty verdict was returned — leaving a period of only six days (from Wednesday, April 11, until Tuesday, April 17) to prepare for the penalty phase. *Id*. Jurek's affidavit states that he did not seek any advice or expert consultation for the penalty phase. Counsel's explanation for doing nothing in preparation for the sentencing phase was his belief that the case would "plead out" and not go to trial. *Id*. at ¶ 8. He acknowledged a lack of strategy. He stated that he "did not present the jury with any mitigating evidence, therefore the closing statement consisted of a plea for mercy." *Id*. at ¶ 18.

If counsel had investigated his case, he would have found a large body of mitigating evidence. The evidence of Hamblin's unstable and deprived childhood presented at the post-conviction proceedings is extensive. Hamblin grew up in extreme poverty and neglect, surrounded by family violence and instability, had a poor education and likely suffers from mental disability or disorder. He grew up in Appalachian Kentucky where his father had a still. His father was very violent and beat Hamblin's mother and Hamblin regularly. Hamblin's father was arrested on several occasions for public intoxication, manufacture of moonshine and child neglect. Hamblin's mother abandoned her children on several occasions, leaving them to fend for themselves, and at times resorted to prostitution. Hamblin tried to provide for himself and a younger sister by stealing and he first stole food as a very young child. He was never educated. He did not attend elementary school with regularity and did not receive any education past the seventh grade. He started getting in trouble with the law as a teenager, resulting in a criminal record as a juvenile. He first left home at 13 and left permanently at 16.

Hamblin first showed signs of mental disorder when he was a teenager — probably resulting from his poor family situation and possibly from a severe blow to the head at about age 8, inflicted by his father with a dog chain, and from a severe infection his mother suffered while pregnant with him, the result of a stabbing inflicted on her by Hamblin's father. Aff. of James P. Eisenberg, Ph. D., *State v. Hamblin*, CR-186558, Ex. E to State Post-Conviction Petition (Ohio App. Aug. 9, 1989). While an earlier mental evaluation did not show signs of organic deficiency, such as retardation, further testing since Hamblin has been in prison shows psychological problems, but whether their origin is psychological, organic or both is not known.

Jurek did not obtain any family or social history nor did he contact any of Hamblin's family members except Rhonda Lezark, the mother of Hamblin's daughter. Jurek Aff. at ¶¶ 13-15. Twenty-two family members and friends filed affidavits with Hamblin's state post-conviction petition relating the violence and deprivation of Hamblin's childhood, each stating that they would have been available and willing to testify at the penalty phase but had never been asked to do so.

Counsel also failed to gather any medical information, including psychological information, on Hamblin. Earlier psychiatric evaluation of Hamblin had shown him competent to stand trial and not to be mentally retarded. Counsel believed, incorrectly, that the issue of competency to stand trial was the only admissible psychological evidence for mitigation purposes. Relying solely on what he was told by Hamblin and the prosecutor — that mental competency to

---

the penalty phase of the trial, and because we have no information as to what Lambros' role was, if any, it is reasonable to conclude that Fred Jurek had sole responsibility for the penalty phase, including preparation.

stand trial was the only relevant issue — counsel did not evaluate Hamblin's mental condition at the time of trial or inquire further into his mental health. Counsel did not review the earlier reports concerning Hamblin's mental status, which were prepared for a previous criminal case involving Hamblin. An evaluation done in 1964 when Hamblin was 13 and had been arrested on juvenile charges stated that Hamblin tends "to alienate himself from other people and appears mistrustful and suspicious of everyone." School records and IQ tests, among other records, were also available but were not collected or reviewed. Nor did counsel contact a mental health professional to help him evaluate the existing reports or to give him advice on using the psychological information previously acquired on Hamblin or to inquire about further psychological testing. Jurek Aff. at ¶ 16.

Only two witnesses were offered at the penalty phase: Rhonda Lezark and Hamblin himself. The entire proceeding consists of about 38 pages and could not have taken more than 45 minutes to present. The prosecution's closing argument at the penalty phase consumes 10 pages out of the 38, while defense counsel's closing argument consists of 3 pages.

Witness Rhonda Lezark was in a long-term relationship with Hamblin and they have one daughter from that relationship. Lezark had testified for the prosecution during the guilt phase. In her testimony at the penalty phase she stated that Hamblin's relationship with their child was good. She had nothing else positive to say during her short testimony. She told the jury about Hamblin's previous prison time and explained that she did not want to testify on his behalf. Hamblin's counsel did not prepare her for her testimony at the penalty phase or interview her in advance.

The only other testimony by the defense during the penalty phase was a relatively short, rambling, almost incoherent, unsworn statement given by Hamblin to the jury in an attempt to explain his background. Counsel admitted he did nothing

to help Hamblin prepare or give this statement. Jurek Aff. at ¶ 17.

Obviously, counsel's failure to investigate and prepare for the sentencing phase of the case violates the ABA standards and applicable case law discussed above, unless there is some other justification for counsel's performance.

### C.

The district court below found two justifications for counsel's performance. First the court found that defense counsel did not further investigate Hamblin's mental condition for the "strategic" reason that such an investigation might not reveal any psychological problems or brain injury, thereby preventing a mitigation theory based on those factors. The court said mitigation evidence "could hurt him as easily as help him if exposed to a jury," and so "Hamblin's attorneys made a strategic decision not to [investigate or] present mitigating evidence about Hamblin's deplorable childhood and wretched upbringing." App., Vol. I, p. 67. Second, the court found that counsel did not investigate or prepare mitigation because his client told him not to present evidence in mitigation.

The first reason for not investigating is not asserted by defense counsel in the record before us and, even if it were, does not make sense. Because counsel does not know what an investigation will reveal is no reason not to conduct the investigation. Counsel was obligated to find out the facts, not to guess or assume or suppose some facts may be adverse. Counsel admitted he was not sure what further investigation or testing might reveal about Hamblin's psychological health or any organic brain damage. In addition, because the district court did not hold an evidentiary hearing or allow any discovery, many details of why counsel failed to investigate are not known. And between the time the habeas petition was filed in late 1995 and the issuance of the district court's order in early 2000, Fred Jurek, the lawyer responsible for the

penalty phase, died. This complete failure to investigate simply cannot be condoned and constitutes a clear constitutional violation.

As to the second justification, the district court said that counsel cannot be ineffective when counsel is simply following a defendant's wishes not to investigate or prepare for the mitigation phase of the case. There is no evidence in the record that counsel informed Hamblin about the importance of mitigation to the penalty phase or the consequences of limiting the penalty phase to his unsworn statement and the testimony of Rhonda Lezark. Since the district court did not permit an evidentiary hearing or discovery in this case, it is not clear what Hamblin said to Jurek about investigating the case or what Jurek advised Hamblin. But ABA and judicial standards do not permit the courts to excuse counsel's failure to investigate or prepare because the defendant so requested, assuming that this finding is factually accurate. The Guidelines state that "the investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented," because

> [c]ounsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation ....

ABA Guidelines § 10.7 (2003) at pp. 80-81. This guideline is supported by our decisions in *Austin v. Bell, supra*, 126 F.3d at 849, and *Coleman v. Mitchell, supra*, 268 F.3d at 447, as well as by a number of cases from other circuits, *see, e.g., Blanco v. Singletary*, 943 F.2d 1477, 1501-03 (11th Cir. 1991) (counsel ineffective for "latching onto" client's assertions that he did not want to call penalty phase witnesses and failing to conduct an investigation sufficient to allow client to make an informed decision to waive mitigation); *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989)

("counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made"); *Knighton v. Maggio*, 740 F.2d 1344, 1350 (5th Cir. 1984) (petitioner entitled to relief if record shows that "counsel could not make a valid strategic choice because he had made no investigation").

Therefore, the two "strategic" justifications for failing to investigate mitigating factors by the court below are insufficient to excuse counsel's performance. Counsel's performance fell well below minimum standards in capital cases.

### III.

The *Strickland* and *Wiggins* cases in the Supreme Court also require us to examine whether counsel's deficient performance prejudiced defendant. This is the second or "prejudice" prong established by *Strickland*. Defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Hamblin must demonstrate that "counsel's errors were serious enough to deprive [him] of a proceeding the result of which was reliable." *Glenn v. Tate*, 71 F.3d 1204, 1210 (6th Cir. 1995). Hamblin has sufficiently demonstrated that the utter failure of his counsel effectively to present at sentencing the wealth of mitigating evidence "undermines confidence in the outcome" of the sentencing phase of his trial.

Under federal law, one juror may prevent the death penalty by finding that mitigating factors outweigh aggravating factors. As the Supreme Court recently said in *Wiggins*, the "prejudice" prong is satisfied if "there is a reasonable probability that at least one juror would have struck a different balance." 123 S. Ct. at 2543.

Ohio is a "weighing" state, which means that the aggravating circumstances must outweigh the mitigating factors in order to impose the death penalty. Hamblin has presented substantial evidence of a childhood in which abuse, neglect, violence and hunger were common. In light of the quantity of mitigation evidence available, we find ourselves unpersuaded that there is a reasonable probability that a jury would have returned the same sentence had the evidence been introduced. Our confidence in the outcome of Hamblin's trial has been undermined by counsel's failure to include the details of Hamblin's background during their penalty phase presentation. In our view, had the available evidence been presented — about Hamblin's mental history and abusive childhood — at least one juror would have voted against the death penalty. He is therefore entitled to a new trial at the penalty phase. The sentencing phase of the trial under Ohio law is obviously a critical stage of the criminal proceeding which can result in the sentence of death and did so in this case. Yet Hamblin's counsel performed virtually no investigation to prepare a defense. Counsel presented no meaningful evidence by way of mitigation as a result of the failure to investigate and prepare, not as a result of trial strategy after thorough research. It is not just that the defense presented on Hamblin's behalf at the sentencing phase was ineffective; rather, Hamblin's counsel did not present any meaningful mitigation evidence at the sentencing phase because he was not *prepared* due to his lack of knowledge and understanding of the sentencing phase of a capital case. This total lack of preparation, investigation and understanding of sentencing caused counsel's deficient performance and extreme prejudice to Hamblin.

## IV.

Because we find that counsel's failure to investigate possible mitigating circumstances constitutes ineffective assistance of counsel warranting a new penalty phase trial for Hamblin, we pretermit any other sentencing issues raised in the habeas petition concerning the sentencing phase of the

case, including whether Hamblin's counsel was ineffective in other aspects of the sentencing phase and whether prosecutorial misconduct at the sentencing phase undermined Hamblin's constitutional right to a fundamentally fair trial. We will now turn to the issues raised by Hamblin concerning the guilt phase of his trial.

### A. Ineffective Assistance of Counsel at Culpability Phase

Hamblin contends that his counsel should have put on an expert pathologist to counter the testimony of the prosecution's expert. The Cuyahoga County Coroner testified that Lillian Merrick was killed by one *or more* blows to the head. Hamblin claims that an independent pathologist might have shown that death resulted from a single blow to the head intended only to disable the victim for purposes of robbing her, not to kill her — a less gory and disturbing scenario of the incident than that presented by the prosecution. The performance of counsel in this respect at the guilt phase was poor, to say the least, because of his failure to try to retain an independent expert, such as a pathologist, to investigate fully the position of the prosecution that the victim received numerous blows to the head, an inference not supported by the evidence in the record before us. He could perhaps have made a showing that there was only one blow to the head and hence raised a stronger inference of lack of intent to kill. But in the end we cannot know the answer because no expert has yet appeared to clarify the issue. Absent such evidence, we therefore cannot say that this failure was harmful to the defendant and that he was prejudiced by it.

The State also called a witness from the Ohio Bureau of Criminal Identification and Investigation to explain electrophoresis, the technique by which the victim's blood was matched to the blood found on a jacket in Hamblin's home. Defendant claims that an expert witness could have explained that electrophoresis is unreliable, especially when performed on post-mortem samples, and such testimony

would have raised doubts about its value in this case. This error was likely harmless given the physical evidence presented at trial to demonstrate defendant's guilt — Lillian Merrick's personal effects were found in the defendant's house and car and the gun found in the house matched that used to shoot the park ranger. Even if defense counsel had called expert witnesses to testify on electrophoresis, it would not likely have changed the outcome of the culpability phase.

## B. Prosecutorial Misconduct/Brady Issues

Defendant raises prosecutorial misconduct in two ways: (1) Inappropriate comments during trial and sentencing and (2) failure to turn over exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

**1. Prosecutor's Comments.** To grant relief for prosecutorial misconduct, the prosecutor's comments must be "so fundamentally unfair as to deny [the defendant] due process" based on the "totality of the circumstances." *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974); *accord Kincade v. Sparkman*, 175 F.3d 444, 445-56 (6th Cir. 1999) (prosecutorial misconduct found where prosecutor inferred that defendant committed other burglaries than the one for which he was standing trial). Specifically, our court takes into account:

the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury and the strength of the competent proof to establish the guilt of the accused.

*Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982) (en banc) (citing *United States v. Leon*, 534 F.2d 667, 677 (6th Cir. 1976)); *see also United States v. Carroll*, 26 F.3d 1380 (6th Cir. 1994).

The prosecutor's repeated reference to the numerous blows received by the victim is not backed by the evidence. The pathologist for the state testified that the victim received *at least one blow* to the head that caused her death. She went on to explain that the body showed no evidence of more than one blow to the head, although she could not rule out that further blows might have occurred that did not show up on the body. Neither this testimony by the state's pathologist, nor any other evidence, supports the prosecutor's inference that the victim was repeatedly hit and beaten. The remarks were prejudicial because they implied that defendant beat the victim beyond all reason when the evidence shows that it is more likely the victim received one blow to the head that killed her.

Despite the inappropriate references by the prosecutor, we cannot say that his comments were "so fundamentally unfair as to deny [the defendant] due process" based on the "totality of the circumstances." Many of the improper comments came during the closing and the jury was instructed by the court shortly thereafter to look only to the evidence, not the comments of the lawyers. Furthermore, the considerable amount of physical evidence pointing to defendant's guilt cannot be ignored. The jury was likely to convict defendant based on this evidence even had the prosecution not made the improper comments. The comments went to the nature and intent of the attack, not to defendant's guilt or innocence of killing the victim. Accordingly, we find that the comments made by the prosecutor were error, but that the jury would probably have returned the verdict of guilty anyway.

**2. *Brady* Violation.** Under *Brady*, the prosecution must disclose favorable evidence to the defendant. Favorable evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Here, the question is whether the government failed to preserve evidence that might have been useful to the defendant. The defendant must show that the government (1) acted in bad faith in failing to

preserve the evidence; (2) that the exculpatory nature of the evidence was apparent and (3) the defendant was unable to obtain similar evidence. *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988).

The State's firearm expert testified that there was a negative result on the defendant's clothes for gunshot residue. The defense was not notified of the results before trial; and, by the time of trial, the state had lost the evidence. Defendant claims that the evidence was necessary because it might have cast doubt on whether he shot the ranger. (The shooting of the ranger and the murder of Lillian Merrick were tried together.) The district court, although finding the claim procedurally defaulted, addressed it and found no bad faith on the part of the government and found the evidence of only "speculative" materiality.

Again, given that the evidence of defendant's guilt is substantial, we cannot find that a "reasonable probability" exists that the state's failure "undermines confidence in the outcome of the trial." Although the government should always turn over results from firearm tests, and it was at fault for failing to do this here, this evidence would not have had an impact on the outcome of the guilt phase nor has it otherwise "undermined" our confidence in the outcome.

### C. Playing Defendant's Taped Statements at Trial

Defendant was arrested at a bar and taken to the police station at 11:30 P.M. the night of the incidents. His statement was taken a little after midnight but Hamblin was not actually cross-examined because he had been drinking. Two more statements were taped later that day and the next (Friday and Saturday, October 14 and 15, 1983). Defendant was given *Miranda* warnings before he was questioned and the prosecution claims that he waived his right to an attorney or to remain silent. Hamblin claims that he did not knowingly waive his *Miranda* rights and was told he could not see a lawyer until Monday. According to defendant, most of the

questioning occurred after he told the police he wanted a lawyer and was told he couldn't have one until Monday.

The tapes themselves contain mostly irrelevant and/or inadmissible ramblings of the defendant about himself. On direct appeal, the Ohio Supreme Court found admission of the tapes to be harmless error because the physical evidence of guilt was substantial. We agree. The tapes contained information about prior crimes, vulgar language from defendant concerning hatred of homosexuals and other general information about defendant and his sordid past. Although the tapes should not have been admitted, we do not believe their introduction affected the guilty verdict. Much of the information on the tapes was cumulative of information that was properly admitted, and the physical evidence pointing to defendant's guilt was very strong, rendering this evidentiary error harmless.

For the foregoing reasons, we reverse the judgment of the district court and order that the writ of habeas corpus be granted unless defendant receives a new penalty phase trial within 180 days of this order.

_____

## DISSENT

_____

ALICE M. BATCHELDER, Circuit Judge, dissenting. I respectfully dissent from the granting of the writ, although I agree that counsel's assistance during the penalty phase of Hamblin's capital trial was deficient. The majority opinion correctly reflects that prior to both the 2003 revisions to the 1989 ABA Guidelines, and the Supreme Court's decision in *Wiggins v. Smith*, 123 S. Ct. 2527 (2003), this circuit handed down several cases requiring that defense counsel in a capital case perform a complete mitigation investigation, including inquiry into the defendant's social, physical, medical and mental history. This case law, which involved assistance of counsel rendered prior to the 1989 ABA Guidelines, sets a standard that is very similar to those 1989 Guidelines. And under the standard articulated by this court in, for example, *Glen v. Tate*, 71 F.3d 1204 (6th Cir. 1995), Hamblin's counsel failed to do the mitigation inquiry required.

I dissent from the granting of the writ because I do not agree with the majority opinion that defense counsels' failure to make the necessary mitigation investigation resulted in the degree of prejudice necessary to meet the *Strickland* requirement. Hamblin is not like the defendant in *Wiggins*, who had been physically abused as a child and, more importantly insofar as the Court was concerned, had been sexually abused repeatedly in foster care throughout his childhood and adolescence. *See, e.g., Wiggins*, 123 S. Ct. at 2537 ("Had counsel investigated further, they may well have discovered the sexual abuse later revealed during state postconviction proceedings."); at 2539 ("[T]he records contain no mention of sexual abuse, much less of the repeated molestations and rapes of petitioner detailed in the Selvog report."); at 2539 ("The [Maryland Court of Appeals] also assumed, erroneously, that the social services records cited incidences of sexual abuse.") Hamblin, although having a

history of physical abuse, had no history of sexual abuse. Unlike Wiggins, who had no prior history of violence or criminal activity, Hamblin had a criminal history that involved acts of violence. Unlike the petitioner in *Glen*, Hamblin cannot point to any medical opinion establishing neurological impairment or global brain damage, nor can he demonstrate mental retardation. And unlike the petitioner in *Glen*, Hamblin cannot complain that while his own counsel failed to present evidence of his mental and psychological deficits, the prosecutor presented expert testimony that he suffered from no such deficits.

Because I do not agree that there is a reasonable probability that Hamblin's jury, had it been presented with the evidence of Hamblin's ugly childhood, would not have imposed the death penalty, I dissent from the granting of the writ.