COLE, Circuit Judge,
dissenting.
Phillips’s crime is heinous. Reading the facts of this ease, as so vividly described in the majority’s opinion, one cannot but feel a deep sense of moral revulsion and horror that one human being could inflict such acts on another. It is for precisely this reason, however, that knowledge of Phillips’s appalling childhood environment— the environment in which he spent his entire life prior to his crime, a world in which violence, criminal activity, and physical and sexual abuse of children were the status quo — is critical in assessing his culpability and determining the punishment he deserves.
The jury that recommended Phillips be sentenced to death, however, heard little evidence about his childhood because his counsel failed to investigate the red flags leading to a large body of mitigating evidence that would have considerably altered the picture of his culpability. By failing to investigate these leads and to discover and present this mitigating evidence to the jury, Phillips’s counsel failed to meet the minimum standard of competency required by the United States Constitution. Because there is also a reasonable probability that, had counsel not failed to meet their constitutional responsibilities, at least one member of the jury would have found that the aggravating circumstances of Phillips’s crime did not outweigh the mitigating circumstances, I would reverse the district court’s denial of Phillips’s petition for a writ of habeas corpus on this score.

i. Counsel’s performance was deficient

Under the constitutional standard we employ when reviewing ineffeetive-assistance-of-counsel claims, we must first determine whether counsel’s performance “fell below an objective standard of reasonableness” and so was constitutionally defi *225 eient. Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Counsel has an obligation to perform a thorough investigation of the defendant’s background or make a reasonable decision that such investigation is unnecessary. See Wiggins v. Smith, 539 U.S. 510, 522-23, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). This obligation exists even if the defendant is reluctant to cooperate or disclose mitigating evidence. See Harries v. Bell, 417 F.3d 631, 638 (6th Cir.2005).
Phillips’s counsel, Kerry O’Brien and Michael Edminister, were alerted to the history of abuse in the Phillips home by two red flags: first, the existence of Summit County Child Services Bureau (“CSB”) records beyond the five files that Edminister reviewed and described in his notes as “very important” for mitigation purposes, and second, the knowledge that CSB had come to the Phillips home to investigate an allegation that Phillips’s father, William Sr., was sexually abusing Tanya, Phillips’s sister. Nonetheless, counsel failed to learn what the CSB files, other than the five to which they were given access, contained or to provide any of the information in those files to Dr. Brown, the psychologist charged with examining Phillips. In fact, Edminister testified that he was “completely unaware of any familial violence” or that the CSB records indicated a long history of complaints and allegations of neglect, abuse, and assault in the Phillips household. (JA Vol. 10 at 5610.) Ed-minister explained that he did not move the trial court to order CSB to provide him with full access to the records because he thought there was no chance of such a motion being granted: In his words, he “had never heard of that before and so I didn’t even bother.” (JA Vol. 10 at 5604.) His lack of knowledge- may have been due to his never previously having worked on the mitigation phase of a trial; certainly, Phillips’s post-conviction counsel do not appear to have had difficulty in obtaining an order requiring CSB to disclose the records. This failure to undertake a full investigation of the CSB records, provide their contents to the psychologist who examined Phillips, and follow the new leads that the files would have generated amounts to constitutionally deficient performance. See Williams v. Taylor, 529 U.S. 362, 395, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (holding that counsel were ineffective because they “failed to conduct an investigation that would have uncovered extensive records graphically describing Williams’ nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records”); Strickland, 466 U.S. at 689-91, 104 S.Ct. 2052 (stating that “counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary” and that “strategic choices made after less than complete investigation are reasonable” only “to the extent that reasonable professional judgments support the limitations on investigation”); Johnson v. Bagley, 544 F.3d 592, 600 (6th Cir.2008) (finding deficient performance where counsel failed to read files obtained from a state agency that would have revealed a different mitigation strategy); Jells v. Mitchell, 538 F.3d 478, 478 (6th Cir.2008) (finding deficient performance where counsel failed to investigate and locate files revealing the petitioner’s unstable and abusive home environment or to present such files to the examining psychologist). As Edminister himself acknowledged, “I suspect that I may have failed [Phillips] in not being more forceful in an attempt to obtain copies of all of these documents.” (JA Vol. 10 at 5617.)
It was not reasonable for counsel to rest their conclusion that no abuse had oc *226 curred on the assurances of Phillips’s parents, as the abusers themselves cannot be assumed to be forthcoming about their own past crimes; nor did Phillips’s own reticence excuse counsel from performing an independent investigation. See Rompilla v. Beard, 545 U.S. 374, 389, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (“No reasonable lawyer would forgo examination of the file thinking he could do as well by asking the defendant or family relations whether they recalled anything helpful or damaging” contained in the file.); Harries, 417 F.3d at 638 (finding that counsel’s failure to follow leads indicating a troubled childhood was deficient and that counsel has a duty to pursue such investigation even if the defendant refuses to cooperate); Coleman v. Mitchell, 268 F.3d 417, 449-50 (6th Cir.2001) (“[D]efendant’s resistance to disclosure of information does not excuse counsel’s duty to independently investigate.”). O’Brien and Edminister’s admission that they distrusted Phillips further demonstrates the unreasonableness of accepting his assurances — despite their awareness of prior CSB involvement with the Phillips family — that no abuse had occurred.
According to the ABA Guidelines on death-penalty representation, which the Supreme Court has used in determining whether penalty-phase counsel’s investigation of a defendant’s background was deficient, see Williams, 529 U.S. at 396, 120 S.Ct. 1495, defense counsel should consider introducing evidence “ ‘that would be explanatory of the offense(s) for which the client is being sentenced,’ ” as well as that which would provide insights “ ‘into the client’s mental and/or emotional state and life history that may explain or lessen the client’s culpability for the underlying offenses.’ ” Johnson, 544 F.3d at 599 (quoting ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.11(F) (rev. ed.2003)). The commentary to the ABA Guidelines charges counsel with reviewing records from government agencies that “ ‘can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse,’ ” such that “ ‘[r]ecords should be requested concerning not only the client, but also his parents, grandparents, siblings, and children.’ ” See Hamblin v. Mitchell, 354 F.3d 482, 487 n. 2 (6th Cir.2003) (quoting ABA Guideline 10.7 Commentary at 80-83). If Phillips’s counsel had met these professional standards, they would have learned of the wealth of mitigating evidence in the CSB records, which in turn would have enabled them to provide Dr. Brown — and the jury — with a true picture of the violent, abusive, and neglectful environment in which Phillips spent his life.
Not only did counsel fail to obtain these files or provide them to Dr. Brown, Ed-minister did not “remember even talking to Dr. Brown until he walked into the courtroom.” (JA Vol. 10 at 5617.) When Edminister was asked whether, as the person “leading the charge on mitigation,” it was possible for him to put together “an effective case without working hand in hand with Dr. Brown,” Edminister replied: “Probably not.” (JA Vol. 10 at 5617.) Nor, given that he delegated most of the responsibility for gathering records to a private investigator — one who, because of counsel’s limited financial resources, had no experience in mitigation-related investigation — could Edminister have prepared an effective mitigation case without whatever evidence the investigator uncovered. Yet the private investigator did not begin attempting to develop information in support of mitigation until six days prior to jury selection in the guilt phase of Phillips’s trial. Without such information, Phillips’s counsel could not have begun preparing significant portions of their miti *227 gation case until during or after the guilt phase. This untimeliness further supports the conclusion that counsel’s performance was deficient. See Williams, 529 U.S. at 395, 120 S.Ct. 1495 (finding it significant in holding counsel’s performance deficient that “counsel did not begin to prepare for [the sentencing] phase of the proceeding until a week before the trial”); Glenn v. Tate, 71 F.3d 1204, 1207 (6th Cir.1995) (concluding that counsel’s failure “to make any significant preparations for the sentencing phase until after the conclusion of the guilt phase ... was objectively unreasonable”).
When he did set about preparing a mitigation case, Edminister explained that he was at a loss as to what strategy he could pursue: “In this kid’s case, we had absolutely nothing to work with, nothing. I mean, you know, everybody we talked to said ... what a nice boy he was. [The crime] was so completely totally out of character. So then how do you develop mitigation ... ?” (JA Yol. 10 at 5614.) As Edminister stated regarding his decision to call Phillips’s father to testify at the penalty phase, “we were grasping, I was grasping at straws in an attempt to try and pull together any live bodies that could testify and say something nice about — say something at all about him.... ” (JA Vol. 10 at 5618.) Significantly, Edminister himself did not find his mitigation strategy plausible: “You tell me how you explain to your client that ... I don’t believe you’re telling the truth. I don’t think you snapped. I think you are some underlying psychotic and we need to develop that in some way.” (JA Vol. 10 at 5616.) Of course, as revealed by habeas counsel and described above, there was a wealth of material available for mitigation that Ed-minister would have discovered had he pursued the leads of which he already was aware. In light of Edminister’s belief that the true explanation for Phillips’s crime lay in Phillips’s psychological condition, no reasonable counsel in Edminister’s position would have abandoned the investigation at the point he did or failed to have a single conversation with Dr. Brown. See Wiggins, 539 U.S. at 524, 527, 123 S.Ct. 2527 (explaining that, in assessing the reasonableness of counsel’s investigation, the court considers whether the quantum of evidence known to counsel should have led to further investigation).
The state court, in concluding that counsel’s performance was not deficient, relied on the fact that trial counsel presented several witnesses attesting to Phillips’s good character and called Dr. Brown to testify about Phillips’s “character deficiencies.” For three reasons, this conclusion was an objectively unreasonable application of the Strickland standard. First, Phillips’s counsel could not have made a reasonable strategic decision not to introduce evidence of Phillips’s abusive childhood environment because they failed to learn of it. See Wiggins, 539 U.S. at 521, 528, 533, 123 S.Ct. 2527; Williams, 529 U.S. at 395, 120 S.Ct. 1495; Strickland, 466 U.S. at 689-91, 104 S.Ct. 2052. Second, even had counsel learned of the evidence, there would have been no strategic benefit to choosing not to present it. Informing the jury of the disadvantages Phillips faced in his everyday life only could have increased the effect of the positive pieces of mitigation evidence, such as the fact that Phillips had not used drugs and the testimony that Phillips was a helpful child. See Williams, 529 U.S. at 396, 120 S.Ct. 1495 (reasoning that counsel’s “failure to introduce the comparatively voluminous amount of evidence that did speak in [the defendant’s] favor was not justified by a tactical decision to focus on [his] voluntary confession”).
Third, the state court was objectively unreasonable in finding that the mitigation *228 evidence that counsel failed to discover would have provided only an additional or alternative mitigation strategy. In making this conclusion, the state appeals court ignored the patent absurdity of counsel’s attempt to persuade the jury that Phillips was a “kind” person “who cared deeply for Ms. Evans’ children,” State v. Phillips, No. 20692, 2002 WL 274637, at *10 (Ohio Ct. App. Feb. 27, 2002), despite the fact that the jury had just convicted him of raping and murdering one of those children. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052 (“[Sjtrategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.”) (emphasis added); see also Johnson, 544 F.3d at 603 (finding prejudice where competent counsel would have discovered evidence that would have altered considerably the mitigation theory presented to the jury). The mitigation evidence that counsel failed to discover would have given rise to a viable mitigation theory where none otherwise existed. Yet the state court inexplicably and unreasonably opined that such evidence “may actually have been less persuasive.” Id. This conclusion cannot stand in light of the considerations above.
In sum, the state court’s determination that Phillips’s representation was constitutionally adequate unreasonably applies federal law as set forth by the Supreme Court.

ii. Counsel’s performance resulted in prejudice

The state court found that, even assuming that counsel were deficient, Phillips was not prejudiced by the jury’s ignorance of the subsequently discovered mitigating evidence. Because the state court decided this constitutional issue in cursory fashion “ ‘without extended discussion,’ ” this court applies a modified form of AEDPA review. See Maldonado v. Wilson, 416 F.3d 470, 476 (6th Cir.2005) (quoting Harris v. Stovall, 212 F.3d 940, 943 n. 1 (6th Cir.2000)). The modified-AEDPA standard of review requires that the court “conduct a careful review of the record and applicable law, but nonetheless bars [it] from reversing unless the state court’s decision is contrary to or an unreasonable application of federal law.” Id.
As the majority notes, to obtain relief under the prejudice prong of Strickland, Phillips is required to demonstrate a reasonable probability that the newly available mitigation evidence would have led to a different result. Wiggins, 539 U.S. at 537, 123 S.Ct. 2527. “A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Thus, if there is a reasonable probability that a single member of the jury would have found, based on both the newly-discovered and any previously introduced mitigation evidence, that the aggravating circumstances of the crime did not outweigh the mitigating circumstances, and if the state court’s conclusion to the contrary was an objectively unreasonable application of federal law, Phillips is entitled to a new penalty-phase trial. See Williams v. Anderson, 460 F.3d 789, 804 (6th Cir.2006); Hamblin, 354 F.3d at 493; see also Wiggins, 539 U.S. at 537, 123 S.Ct. 2527. Phillips has met this burden.
In the mitigation phase of the trial, the jury was presented with a picture of Phillips as a “nice,” “normal” young man, who generally was non-violent and “good with children.” As noted, these claims were absurd in light of the jury’s conviction. Edminister himself acknowledged that the portrayal of Phillips as a good kid who snapped did not make sense. The falsity of this story became even more apparent when Phillips’s mitigation witnesses, in- *229 eluding his eonvicted-felon parents, admitted on cross-examination that Phillips had struck Evans in the past and been suspended from school for violent outbursts. Nor is it any surprise that Dr. Brown’s testimony failed to reduce Phillips’s culpability in the eyes of the jury. Dr. Brown benignly described Phillips as “rather simple [and] emotionally immature” and unpersuasively explained the brutal rape and murder as the result of Phillips’s “repeated frustrations in his life,” which caused his “anger [to] build[ ] up so that it comes out and it seems way out of proportion to what may trigger it....” Such evidence was useless to a jury seeking to understand why a person could have done what Phillips did.
If Phillips’s attorneys had pursued the leads of which they were aware, they would have discovered the mitigating evidence that would have allowed the jury to better understand what led Phillips to commit his horrific crime. See Penry v. Lynaugh, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (“Evidence about the defendant’s background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background ... may be less culpable than defendants who have no such excuse.”); Johnson, 544 F.3d at 604-05 (finding prejudice where no witness testified about the abuse and privation the defendant and his brother suffered as a way of life, and where evidence of the defendant’s abusive childhood environment would have presented the jury with a plausible reason to spare the defendant’s life). Had counsel fulfilled their constitutional duty, the jury would have known that Phillips grew up undernourished and without adequate clothing in a house littered with dog feces and crawling with cockroaches. They would have heard that his parents regularly bought shoplifted items from their drug-clientele, that as a seventh-grader he watched as his parents and half-sister were arrested in a drug raid at his home. They would have heard that prostitution was common on the street in front of Phillips’s home and that he was exposed to drugs and sexual activity at a young age because of parties thrown by his parents. Most importantly, the jury would have heard of the repeated reports that the Phillips children were being severely abused.
The jury heard that Phillips was a normal, all-American boy who liked to play with model airplanes. The jury did not hear, however, what the CSB records and the affidavits of Phillips’s half-siblings reveal: that he was surrounded by violence, without interruption, from the time of his birth to the age of nineteen. Instead of the rosy and wholly unbelievable picture Phillips’s counsel. presented, the jury should have heard that Phillips’s father beat him, beat his mother, broke dishes over his half-sister’s head when she failed to clean them properly, beat his twelve-year-old brother over the back with a two-by-four, and punched the children — male and female alike — in the face. They should have heard that Phillips’s father regularly threw Phillips’s half-brother and two half-sisters against the wall to punish them and grabbed Phillips’s half-brother by the hair, just as Phillips would later do to Sheila. They should have heard that Phillips’s father molested his half-sisters, one of whom was mentally retarded, and abused them while they were naked, even after they had reached high-school age, leaving bruises that lasted for a month. They should have heard that Phillips’s half-brother Eddie believed his step-father was having sexual relations with Phillips’s younger sister and that the CSB had investigated a similar allegation. But the jury heard none of this because, as Phil *230 lips’s counsel admitted regarding the evidence they presented at the penalty stage, “we had absolutely nothing to work with, nothing.” See Johnson, 544 F.3d at 604 (finding prejudice where, due to counsel’s failure to investigate, the jury was misled into believing that the defendant’s grandmother raised him properly and provided him with a stable life, when in fact both she and the defendant’s mother provided the defendant with a violent, abusive childhood).
In describing the Phillips home as “an unpleasant living environment,” the majority turns a blind eye to the abhorrent conditions that Phillips endured and their effect on his moral and emotional development. It is difficult to understand how the majority, in weighing the aggravating evidence against Phillips, can describe his crimes as “particularly heinous,” while dismissing the violence he and his siblings suffered — acts of the same order of odiousness as those he committed — as merely “unpleasant.” It is also difficult to understand the majority’s argument that the fact that much of the undisclosed mitigating evidence focuses on the abuse of Phillips’s siblings, not Phillips himself, offers “towering” support for the conclusion that this evidence could not outweigh the aggravating evidence in the minds of the jury. Even were it to be shown that Phillips miraculously was spared the violence to which the other children in the household were repeatedly and brutally subjected, growing up in this environment and witnessing this abuse undoubtedly would have left its mark. But, in a household of rampant and indiscriminate violence, it beggars belief to suggest that Phillips was so spared. The testimony of Dr. Smith, armed with the evidence that Phillips’s counsel failed to provide Dr. Brown at the penalty phase, offers a compelling argument as to why Phillips may not have shared this information. In his words,
children who come from an abusive home, their first response is to deny that there’s any abuse in the home. They are filled with guilt, shame, embarrassment. There’s concerns about what other people will think. There is concern about reprisal within the family. Oftentimes, the child who breaks the code of silence will be rejected and shunned by other members of the family.
(JA Vol. 10 at 5761-62.). Yet despite Phillips’s lack of disclosure, it was Dr. Smith’s unequivocal opinion that Phillips had been abused:
The difficulties Mr. Phillips has experienced with his interpersonal relationships, especially his sexual relations, strongly suggest that he was the victim of sexual abuse. The research has identified several characteristics of victims of sexual abuse (e.g., feelings of guilt and shame, difficulty with impotence, confusion about the role of sex-enmeshed with sadistic and masochistic behavior). Mr. Phillips reported many of these behaviors.
(JA Vol. 11 at 6590.) Incidentally, this conclusion is consistent with Phillips’s otherwise jarring focus, when confessing his crimes to the police, not on being accused of murder or on the sentence he might receive, but rather on the fear of “get[ting] pumped in the butt” if sent to jail. State v. Phillips, 74 Ohio St.3d 72, 656 N.E.2d 643, 652 (1995).
It appears incontestable that the jurors would have viewed Phillips differently had they heard a psychologist opine, based on traits that Phillips shared with many adult men who had been sexually abused as children, that Phillips had been sexually abused himself, and that his refusal to admit such abuse was unsurprising. Equipped with an accurate picture of Phillips’s background, Dr. Smith also could *231 have testified, as he did at the habeas phase, that Phillips suffered from at least borderline personality disorder, if not a more serious disorder, as the direct result of the trauma he experienced in his formative years. He could have offered the jury an explanation for the otherwise inexplicable fact that Phillips, with encouragement from Evans, had raped a three-year-old girl. Finally, he could have testified, based on clinical experience, to the likelihood of what might otherwise have seemed impossible to the jury: that Evans, like other women with a history of abuse and mental illness, had encouraged and participated in the abuse of her own child, and that her sway over Phillips was due to his own childhood abuse and resulting personality disorder. Instead of hearing this evidence, the jury heard from Dr. Brown that, while immature and prone to frustration, Phillips had no mental problems and was essentially normal. See Johnson, 544 F.3d at 605 (finding prejudice because mitigation expert gave damaging testimony that he would not have given had he been provided “a more complete picture of [the defendant’s] background — namely, the [defendant’s] remarkably traumatic childhood”).
The new evidence that Phillips could have introduced is the opposite of cumulative. Rather, it would have provided counsel, who was “grasping at straws,” with a viable mitigation strategy. See Rompilla, 545 U.S. at 393, 125 S.Ct. 2456 (finding prejudice where the evidence counsel failed to discover “adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury”); Morales v. Mitchell, 507 F.3d 916, 951 (6th Cir.2007) (noting that we have “found prejudice'when the jury was deprived of non-cumulative mitigating evidence such as severe physical, psychological, or sexual abuse, a violent upbringing, or abject poverty”). The evidence withheld from the jury is similar to evidence that has led us to find prejudice in previous cases. In Jells, for example, counsel presented mitigation evidence focusing on the petitioner’s quiet, non-violent nature and love of his family and called a psychologist who testified, like Dr. Brown did here, that the petitioner had borderline intelligence and difficulty controlling his hostility but no personality disorder or mental illness. 538 F.3d at 499. We found prejudice based upon evidence that Jells’s counsel had failed to present that bears a striking similarity to that at issue here: Jells’s mother was an alcoholic; Jells saw his mother’s boyfriends beat her and was occasionally beaten by them himself; Jells had a history of violence in school and learning and socialization impairments; and, as psychologists provided with an accurate description of Jells’s history concluded, Jells’s “abusive home environment had a profound impact on [his] psychological development.” Id. at 499-500. Similarly, in Hamblin, we found that the petitioner was prejudiced when his counsel failed to present evidence of an unstable and deprived childhood characterized by extreme poverty, neglect, and family violence, as well as signs of a mental disability or disorder. 354 F.3d at 489-91. All of these elements are present here.
Numerous other decisions support the conclusion that counsel’s deficient performance in this case prejudiced Phillips. In Williams, we found prejudice where, due to counsel’s inadequate investigation, the jury never learned that petitioner “grew up in an environment[ ] in which there was an expectation that violence can and sometimes needs to be used, that people are constantly attempting to exploit others, and that illegal activities are often to be admired.” 460 F.3d at 804-05. The other evidence that counsel failed to discover and present in that case would have shown *232 that the petitioner’s alcoholic mother frequently hit him, that his father left his mother when the petitioner was young, that his primary role model was an uncle who was a career criminal, that the petitioner was dependent on cocaine that induced paranoid fears at the time of the crime, and that he suffered from dyssocial reaction and mixed personality disorder. Id. This body of evidence is not materially different from the evidence in Phillips’s case. Similarly, in Johnson, although some aspects of the abuse suffered by the petitioner were more severe than in this case, we found prejudice because the jury was not informed that abuse was “a way of life” during the petitioner’s childhood. 544 F.3d at 604. We noted that a fully-informed psychologist would have opined to the jury that the abuse Johnson suffered caused his mental illness and that such a psychologist would have described to the jury “the cycles of generational abusive and neglectful parenting that repeat the same behaviors and lead to the same outcomes.” Id. at 605-06 (internal quotation marks omitted). In Harries, we found prejudice where counsel’s deficient investigation failed to uncover evidence of “Harries’s traumatic childhood, including the significant physical abuse Harries suffered at the hands of’ his family, as well as the fact he spent much of his childhood in violent and unsanitary institutions; the fact that he suffered from a mental illness that may have been bipolar disorder, anxiety disorder, post-traumatic stress disorder, or antisocial personality disorder; and the fact that he had suffered frontal-lobe damage. 417 F.3d at 639.
In Dickerson v. Bagley, we found prejudice where counsel’s inadequate investigation failed to reveal that the petitioner functioned only slightly above the retarded level and was raised in a home where his biological father denied his relationship and where he was called the “the moron” and surrounded by “pimps, prostitutes and drug dealers.” 453 F.3d 690, 698-99 (6th Cir.2006). In Carter v. Bell, we found prejudice because counsel failed to present evidence “of a childhood in which abuse, neglect and hunger were normal,” in addition to evidence that petitioner suffered from schizophrenia and psychosis. 218 F.3d 581, 600 (6th Cir.2000). In Coleman, we found prejudice where the jury never heard that petitioner was exposed to group sex and pedophilia, nor was told of petitioner’s “probable mixed personality disorder with antisocial, narcissistic, and obsessive features,” nor of the likelihood he had organic brain problems and manic-depressive disorder. 268 F.3d at 449, 451; see also Glenn, 71 F.3d at 1207 (“[T]he jury was given virtually no information on [defendant’s] history, character, background and organic brain damage — at least no information of a sort calculated to raise reasonable doubt as to whether this young man ought to be put to death.”).
In sum, this case is well within the range of this court’s precedent finding prejudice resulting from ineffective assistance of counsel. Even under our modified-AEDPA review, I find that the state court unreasonably applied Strickland when it failed to find that Phillips was prejudiced by counsel’s failure to present to the jury the violent and abusive childhood revealed by the CSB records and his half-siblings’ affidavits, or the testimony of a fully-informed psychologist who could attest that Phillips was sexually abused and suffered from, at the very least, borderline personality disorder. The undiscovered evidence would have allowed the jury to better understand how a nineteen-year-old who had never lived outside the control of his abusive parents could have committed a crime of such shocking atrocity. Phillips’s culpability undoubtedly would have been reduced in the jury’s eyes if they had *233 known that his only male role model had taught him by life-long example that it was appropriate to physically and sexually abuse the children in one’s care. Viewed in relation to this evidence, Phillips’s crime, atrocious as it was, becomes more comprehensible. Had this evidence been presented by competent counsel, there is a reasonable probability that at least one juror would have voted not to put Phillips to death.