IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 6, 2018

**MARIO JOHNSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 11-07452    James C. Beasley, Jr., Judge**

———————————

**No. W2017-02461-CCA-R3-PC**

———————————

The Petitioner, Mario Johnson, appeals from the denial of his petition for post-conviction relief, wherein he challenged his jury convictions for aggravated assault and misdemeanor reckless endangerment. On appeal, the Petitioner alleges that he received ineffective assistance from his attorneys (1) because counsel[1] failed to seek a hearing under Tennessee Rule of Evidence 609 to determine which of the Petitioner's former convictions could have been used against him at trial had he chosen to testify; and (2) because lead counsel failed to present any mitigation witnesses at the sentencing hearing. After a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

Megan R. House, Bartlett, Tennessee, for the Appellant, Mario Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Steve Ragland, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

The November 2011 term of the Shelby County Grand Jury charged the Petitioner with attempted second degree murder and alternative counts of aggravated assault by

---

[1] For purposes of clarity, we will refer to the Petitioner's trial attorneys collectively as "counsel" and individually as "lead counsel" or "associate counsel."

causing serious bodily injury or by using a deadly weapon. See Tenn. Code Ann. §§ 39-12-101, -13-102, -13-210. Following a jury trial, the Petitioner was convicted of the two counts of aggravated assault as charged and of one count of misdemeanor reckless endangerment as a lesser-included offense of the attempted second degree murder offense. See State v. Mario Johnson, No. W2013-01124-CCA-R3-CD, 2014 WL 1004516, at *1-2 (Tenn. Crim. App. Mar. 13, 2014), perm. app. denied (Tenn. Aug. 29, 2014). Thereafter, all verdicts were merged into a single conviction for aggravated assault, and the Petitioner was sentenced as Range III, persistent offender to fifteen years' incarceration. Id. at *2.

The victim testified to the following events at trial:

On the evening of Saturday August 6, 2011, [the victim] was drinking beer with friends in the front yard of his home. This group included the [Petitioner], whom the victim had known as an acquaintance from the neighborhood for about three years. The men [were] engaging in a conversation about jobs and careers, when the [Petitioner] interrupted the victim. The victim admitted that he did not "want to hear what [the Petitioner] had to say" and called the victim something like a "punk a-s n----r." When the [the Petitioner] responded, the victim hit the [the Petitioner] and wrestled the [Petitioner] to the ground. Neither individual was armed at this point.

After the fight, the [Petitioner] got up off the ground and walked home, threatening that "he would be back." The other men also left the gathering, but the victim remained in the yard outside his home. According to the victim, about five to ten minutes later, he saw the [Petitioner] walking back down the street at a "fast pace" towards him. The victim began cursing at the [Petitioner], saying that he was not afraid of the [Petitioner]. Although the victim could not remember specifically what he said to the [Petitioner], he acknowledged that it was "something vulgar," "provocative," and "hateful." However, upon seeing that the [Petitioner] was carrying a butcher knife, the victim ran away.

The victim testified that he "ran about four houses down, jumped a gate, went behind a house and sat down for a minute to get [his] thoughts together[.]" After about five minutes had passed, he came from behind the house and began walking home. The victim believed it was after midnight at this time. As the victim exited from behind the house, he did not see the [Petitioner] but, nonetheless, started yelling loudly with his hands in the air, "Mario, let's squash it. Let's squash it." As the victim neared his aunt's

house, the [Petitioner] came out from a "dark bushy area" and stabbed the victim, twice in the chest and then once on the arm and once on the hand.

Johnson, 2014 WL 1004516, at *1 ("Defendant" altered to "Petitioner" throughout; all other alterations in original). No other witnesses testified about the facts of the offense. Id. at *2.

On September 9, 2015,[2] the Petitioner's pro se petition seeking post-conviction relief was filed, and that petition was later amended following the appointment of counsel. In the amended petition, the Petitioner alleged that he received ineffective assistance (1) because counsel failed to seek a hearing under Tennessee Rule of Evidence 609 to determine which of the Petitioner's former convictions could have been used against him at trial had he chosen to testify; and (2) because lead counsel failed to present any mitigation witnesses at the sentencing hearing. The post-conviction court held an evidentiary hearing on November 28, 2017.

Lead counsel stated that he had practiced law since 2004. Lead counsel testified that he received discovery in this case and shared that information with the Petitioner. According to lead counsel, he met with the Petitioner "a number of times" prior to trial.

Lead counsel testified that the defense strategy was to pursue a claim of self-defense and that they "tried to get an element of something of that nature . . . elicited from the stand to . . . mitigate . . . down the . . . attempted second degree murder" charge. Lead counsel noted that they were partially successful because the Petitioner was found not guilty of attempted second degree murder as charged but guilty of only the lesser-included offense of misdemeanor reckless endangerment.

Lead counsel maintained that, during his discussions with the Petitioner about trial preparation, the Petitioner "was adamant" that he did not want to testify and that he "did not want any witnesses" that were present during the August 6, 2011 altercation called on his behalf. Nonetheless, lead counsel investigated and tried to find witnesses to these

---

[2] The State filed a motion to dismiss the petition as untimely. The petition was notarized on August 31, 2015, and the Petitioner stated therein that he mailed it the same day. After a hearing, the post-conviction court denied the State's motion, finding that the Petitioner had complied with the "prison mailbox rule." See Tenn. R. Crim. P. 49(d) (providing that documents filed by pro se inmates "may be considered filed within the prescribed time if delivered to the appropriate prison authority for mailing within the time allowed for filing"). The post-conviction court reasoned that, because the one-year deadline, August 29, 2015, was a Saturday, the Petitioner had until the following business day, Monday, August 31, 2015, to file his petition, and he did so. The post-conviction court further determined that due process required tolling of the limitations period given that the prison was on "lockdown" status from August 26th to August 29th, and "only inmate workers were allowed to resume normal activities" on Sunday the 30th. The State does not challenge this ruling on appeal.

events. Lead counsel said that he did interview one of the men that was present that evening, although that conversation convinced him that those witnesses were not going to be helpful. Moreover, lead counsel said that, after his investigation, he "deduce[d] maybe why [the Petitioner]" did not want those witnesses called. Lead counsel agreed that it was "probably a good idea not to call them[.]" According to lead counsel, the Petitioner was never "dissatisfied with the witnesses not being called."

Lead counsel stated that he spoke with Mr. Leonard Draper who testified at trial and also with Leonard's son ("Harold"),[3] although he could not recall any details about those discussions.[4] According to lead counsel, the defense had subpoenaed Harold who was present during the Petitioner's trial. Lead counsel explained, "[W]hat we wanted to do was [have Harold] there[,] so we could make sure that the victim would be forthright on . . . what happened. And once [the victim] was, you know, what it appeared, . . . accurate" during his testimony, Harold was not needed to testify. Regarding having Harold testify about provocation, lead counsel noted that Harold "was just standing [around]" during the initial altercation on August 6th and that the information about provocation was elicited in other ways from the witnesses at trial.

Lead counsel explained how they planned to present a theory of self-defense to the jury. Lead counsel stated that they sought to have to the Petitioner's police statement, wherein the Petitioner expressed that the victim "had previously struck him," admitted into evidence but that the trial court excluded that statement as "self-serving." However, lead counsel "believe[d] that [they] had enough evidence that [they] could elicit enough on cross-examination" of the victim to show that the Petitioner "was provoked to some degree in his actions."

When asked about his understanding of the trial court's ruling refusing to issue a jury instruction on self-defense, lead counsel acknowledged that the trial court determined that there were two different episodes at play and that an instruction was not warranted by the facts to which the victim testified. Lead counsel conveyed that, as he understood it, the trial court ruled that the Petitioner's prior "record" would come in if the Petitioner chose to testify on his own behalf. Lead counsel was asked if he discussed with the Petitioner "which of [the Petitioner's] priors would come in" if the Petitioner chose to testify, and lead counsel replied, "I believe we did." Lead counsel believed that they "had some dialogue" on the issue of which convictions would have been admissible. Lead counsel agreed that the Petitioner "had significant felony convictions" and that, in

---

[3] Because these two individuals share a surname, we will refer to Harold by his first name. We intend no disrespect in so doing.

[4] It is not entirely clear from the record whether Harold was the only fact witness lead counsel spoke to or if there were others.

-4-

addition to being used as impeachment evidence, those convictions might have been admissible under Tennessee Rule of Evidence 404 if the defense brought up "issues about character and what went on that night."

Lead counsel also averred that "there were other issues with [the Petitioner's] testifying as well," noting that the Petitioner had pled guilty and had been sentenced just before trial for a case involving multiple aggravated assaults against some of the same individuals. Moreover, there were concerns about how the Petitioner would come across to the jury and if he could "survive" cross-examination. Lead counsel testified that, after he and the Petitioner discussed the Petitioner's testifying and the different considerations involved, the Petitioner made it clear that he did not want to take the stand. According to lead counsel, this decision was made by the Petitioner both "early on" in the case and again at trial.

When asked why he did not present any individuals at the sentencing hearing to testify about the Petitioner's history with the victim, including that the victim had hit the Petitioner and that they had gotten "into it," lead counsel responded that the Petitioner had already received the maximum sentence of fifteen years on the prior aggravated assaults and that "there were no mitigating factors proven at sentencing" for those offenses. Lead counsel believed that the Petitioner "would [also] get a stiff sentence" for this conviction due to the Petitioner's record. According to lead counsel, he "made a number of arguments at the sentencing hearing to get a lower sentence" for the Petitioner, to no avail.

Associate counsel, who had thirty-three years' legal experience, participated in the Petitioner's trial at lead counsel's request. Regarding whether the Petitioner's prior "extensive record" would come into evidence if the Petitioner chose to testify, associate counsel said, "If I recall correctly there were aggravated assaults, there were convictions . . . [that in] my judgment would [have] be[en] violent behavior or aggressive behavior." Associate counsel likewise did not seek to have a Rule 609 hearing to determine the admissibility of those prior convictions. Associate counsel testified that, in addition to the Petitioner's prior record possibly being used as impeachment evidence against him under Rule 609, more of those convictions might have been admissible under Tennessee Rule of Evidence 404 if the "door was open[ed.]"

Associate counsel confirmed that, in light of the trial court's ruling at trial "on the self-defense first aggressor issue," they could not "[a]rticulate a fear" or present a theory of self-defense absent the Petitioner's testimony. However, associate counsel opined that "it [was too] risky for [the Petitioner] to testify based on his record and what could [have] or m[ight have] come out" at trial. Associate counsel noted that, "ultimately[,] the decision was left up to [the Petitioner]." When asked if he believed that the Petitioner made an informed decision not to testify, associate counsel responded affirmatively,

noting that the Petitioner was "an intelligent man" who had "been through the system" and that the Petitioner was aware of his criminal record and of the dangers of cross-examination. According to associate counsel, "there was never a situation where [the Petitioner] wanted to testify," and associate counsel said that it was never a decision seriously debated by the Petitioner.

Associate counsel agreed that a <u>Momon</u> hearing[5] was conducted in this case. Moreover, associate counsel noted that, after the <u>Momon</u> hearing, the defense did not present any witnesses and rested.

When asked if he spoke with any of the witnesses involved in this case, associate counsel asserted his belief that lead counsel had interviewed these men and opined that "[t]hese were individuals, the majority of them, that had had contact with the judicial system or with the courts and they just didn't want to get involved." According to associate counsel, he witnessed a phone interview where lead counsel was obviously "frustrated" because the individual "did not want to get involved whatsoever." Associate counsel referred to the men as "a group of kindergartners." Associate counsel also noted that the Petitioner "wasn't very interested in trying to make anyone come and testify."

Associate counsel stated that he did not participate in the sentencing hearing, although he and lead counsel did have discussions about it. Associate counsel maintained that the "goal" was "the lowest possible sentence." In addition, associate counsel remarked that the Petitioner "was very satisfied" with the "outcome of the trial" prior to sentencing because the Petitioner was acquitted of the attempted second degree murder charge.

Harold Draper testified that he was subpoenaed by both the State and the defense to the Petitioner's trial, but he was not call to testify. Harold stated that he was present during the initial altercation on August 6, 2011, and that he tried to get the victim to calm down and leave with him, but was unsuccessful. According to Harold, the victim "became a little belligerent" that evening when talking with the Petitioner "about jobs and careers" and the Petitioner had called the victim "something slur." The victim "started yelling vane and profane obscenities" before slapping the Petitioner in the face and wrestling the Petitioner to the ground. After the victim slapped the Petitioner, the men "kind of like took off and went their ways because it had [gone] too far." Harold said that the Petitioner left, so Harold got in his car and asked the victim to leave with him. Harold said that he waited for approximately fifteen minutes but the victim would not get inside the car and "was still yelling vane and profane . . . obscenities." When the

---

[5] Referring to <u>Momon v. State</u>, 18 S.W.3d 152 (Tenn. 1999), where our supreme court outlined a prophylactic procedure designed to insure that a defendant's waiver of his right to testify is voluntary, knowing, and intelligent.

victim told Harold that the Petitioner had returned, Harold "offered [the victim] one more time to get in" the vehicle, but the victim "cussed [Harold] out," so he left. Harold affirmed that he would have testified at the Petitioner's sentencing hearing, but no one contacted him.

The Petitioner testified that the "main argument" presented at trial was self-defense. According to the Petitioner, the trial court ruled that "a third party witness" would not be allowed unless he took the stand and testified in his own defense. The Petitioner stated that the reason he did not ask for any witnesses to be called at his trial was because there were no witnesses to the stabbing itself and the victim himself told the jury that he had slapped the Petitioner that evening. However, the Petitioner maintained that the victim lied at trial regarding the events preceding the stabbing, claiming that the victim never ran away and hid but instead attacked him upon his return, slamming him to the ground, and it was then, after breaking loose, that he stabbed the victim. The Petitioner further asserted that the knife he used to stab the victim was not a butcher knife and that the victim never saw the knife.

In addition, the Petitioner stated that he considered testifying at trial to establish self-defense, but he assumed that all of his prior convictions were admissible if he did so. According to the Petitioner, his attorneys never told him about a Rule 609 hearing and the possibility that some of his older convictions might have been excluded. The Petitioner asserted that he would have testified if his attorneys had explained that not all of his prior convictions were admissible. However, the Petitioner confirmed that his attorneys did explain to him "that in some of the preliminary motions that the [State] had advised the [c]ourt and the [d]efense that if they were to attack the victim's character and they were to say that the victim was the first aggressor," then pursuant to Rule 404, the State was going to try to "bring in [the Petitioner's] convictions as part of their case-in-chief." The Petitioner claimed that his attorneys "didn't really go into detail," though. According to the Petitioner, his attorneys told him "it wouldn't be wise to testify," so he took their advice.

Regarding his criminal record, the Petitioner claimed that he only had one felony conviction in the ten years prior to his trial. He stated that this was "the assault that [he] caught before." The Petitioner acknowledged that he was on bond for the prior assaults when the stabbing in this case occurred. Additionally, the Petitioner confirmed that he had prior convictions for aggravated assault (1997), forgery (2000), identity theft (2000), drugs (2003), and felony DUI (2010), in addition to "priors before [19]97."

The Petitioner maintained that, given that his attorneys did not discuss Rule 609 with him, he did not make an informed decision about whether to testify. Moreover, the Petitioner claimed that he only stated at the Momon hearing that he did not want to testify because he believed his entire criminal record would have been admitted if he did.

-7-

The Petitioner further relayed that the victim had assaulted him three weeks prior. Moreover, the Petitioner claimed that he had been assaulted in prison, which resulted in a broken nose and eleven stitches. The Petitioner averred that "all of it was just going through [his] mind" when the victim attacked him. According to the Petitioner, his testimony would have established his "state of mind" that the victim was not going "to leave [him] alone."

While the Petitioner noted that his attorneys did not call Harold to testify at trial even though Harold was present in the courtroom, the Petitioner acquiesced that he did not complain when they rested at trial without presenting any witnesses. However, the Petitioner asserted that he did not know it was even an option to present witnesses at the sentencing hearing.

The post-conviction court thereafter denied the Petitioner relief by written order filed on December 1, 2017, concluding therein that the Petitioner had failed to establish his claims of ineffective assistance of counsel. This timely appeal followed.

ANALYSIS

On appeal, the Petitioner raises the same issues as those in his amended petition and submits that the post-conviction court erred when it denied him relief. The State responds that the post-conviction court correctly concluded that the Petitioner failed to carry his burden of proving that counsel were ineffective.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts

"must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94. On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

First, the Petitioner contends that the post-conviction court's "holding that the [Petitioner] was not prejudiced by counsels' failure to request a hearing pursuant to Tennessee Rule of [E]vidence 609 because the [Petitioner's] testimony would not have necessitated a self-defense jury instruction was in error." According to the Petitioner, when the trial court ruled at the close of the State's case-in-chief that self-defense had not

yet been raised by the proof, "the only possible way left to do so would [have been] for the [Petitioner] to testify[.]" The Petitioner maintains "that he did not testify at trial because his attorneys advised him that[,] if he were to testify[,] that his prior record would [have been] admissible for impeachment, and thus, presented to the jury, who would [have been] prejudiced by it." The Petitioner asserts that counsels' failure to seek a Rule 609 hearing to determine which of the Petitioner's prior convictions were admissible impeachment evidence if the Petitioner chose to testify amounted to ineffective assistance. The Petitioner avers that he would have testified at trial if he had known specifically which of his prior convictions were admissible against him as impeachment evidence because he then could have presented the theory of self-defense to the jury.

The post-conviction court found the Petitioner's claim in this regard to lack merit. The post-conviction court stated that "a better practice" would have been for counsel to request a hearing pursuant to Rule 609 to see which of the Petitioner's prior convictions "would [have been] used against him for impeachment purposes had he testified[,]" and that counsel "should have requested [such] a hearing[.]" Regardless, the post-conviction court noted that the Petitioner "had four or five felony convictions which could [have been] used to impeach him and many more which could have been used against him to show his aggressive behavior." The post-conviction court also found that the Petitioner "expressed to his attorneys and to the court that he did not wish to testify." Ultimately, the post-conviction court concluded that, based upon the testimony at the post-conviction hearing, the Petitioner "never intended to testify regardless of which priors could [have been] used against him" at trial.

Both lead counsel and associate counsel testified that the Petitioner was adamant that he did not wish to testify. They stated that the Petitioner was advised as to the advantages and disadvantages of testifying and that he made a valid decision not to testify.

Lead counsel testified that he believed that they "had some dialogue" on the issue of which of the Petitioner's convictions would have been admissible had the Petitioner chosen to testify. Lead counsel also averred that "there were other issues with [the Petitioner's] testifying," noting that the Petitioner had just been sentenced for the prior aggravated assaults and that there were concerns about how the Petitioner would come across to the jury. Lead counsel testified that, after he and the Petitioner discussed the Petitioner's testifying and the different considerations involved, the Petitioner made it clear it he did not want to take the stand.

Associate counsel opined that "it [was too] risky for [the Petitioner] to testify based on his record and what could [have] or m[ight have] come out" at trial. Associate counsel maintained that the Petitioner made an informed decision not to testify, noting

that the Petitioner was "an intelligent man" who had "been through the system" and that the Petitioner was aware of his criminal record and of the dangers of cross-examination. According to associate counsel, it was never a decision seriously debated by the Petitioner.

We agree with the post-conviction court that, based upon the testimony at the post-conviction hearing, the Petitioner "never intended to testify regardless of which priors could [have been] used against him" at trial. The post-conviction court clearly credited counsels' testimony over the Petitioner's, which is a determination we will not disturb on appeal. See Fields, 40 S.W.3d at 456. Despite the post-conviction court's language about counsels' failure to follow the "better practice," we cannot conclude that the counsels' performance amounted to deficient representation.

Moreover, the Petitioner has failed to demonstrate that the failure of counsel to request a 609 hearing caused him prejudice. Regardless of the admissibility of the Petitioner's convictions for impeachment purposes, there was the possibility that many of his convictions could have been admitted had he testified at trial. See Frederick Greene v. State, No. W2014-01216-CCA-R3-PC, 2015 WL 9659906, at *14 (Tenn. Crim. App. Nov. 19, 2015) (citing Gregory Hill v. State, No. E2014-01686-CCA-R3-PC, 2015 WL 5275964, at *6 (Tenn. Crim. App. Sept. 10, 2015)); see also Michael Braxton v. State, No. M2006-01894-CCA-R3-PC, 2007 WL 1988141, at *4 (Tenn. Crim. App. July 10, 2007). The Petitioner could have opened the door to the convictions. Hill, 2015 WL 5275964, at *6 (citing State v. Kendricks, 947 S.W.2d 875, 883 (Tenn. Crim. App. 1996)). The convictions also may have been admitted as substantive evidence under Tennessee Rule of Evidence 404(b) to rebut a claim of self-defense. Id. The Petitioner has not demonstrated a reasonable probability that had counsel conducted a Rule 609 hearing, he would have testified and that his testimony would have affected the outcome of his trial.

Next, the Petitioner claims the post-conviction court's "holding that the presentation of mitigating evidence at sentencing would not have changed the sentence imposed, and thus [lead] counsel was not ineffective[,] was in error and contrary to law." The Petitioner notes that lead counsel failed to call any witnesses at the sentencing hearing and failed to introduce any other proof that the Petitioner "acted under strong provocation, a mitigating factor." Moreover, according to the Petitioner, "not only did [lead] counsel fail to ask him if he had witnesses that could present mitigating evidence at his sentencing hearing," but he "was not even aware that he could have witnesses at sentencing."

Citing Austin v. Bell, 126 F.3d 843 (6th Cir. 1997), the Petitioner maintains that "the law is clear that the failure to present mitigating evidence because counsel does not think it will have an effect is not trial strategy but rather an abdication of advocacy." The

Petitioner acknowledges that lead counsel argued at the sentencing hearing "that the proof presented entered at trial showed that the victim provoked the [Petitioner] and that the [Petitioner's] actions were responsive to that of a primary aggressor." However, according to the Petitioner, "due to [trial] counsel's failure to raise self-defense as an issue at trial, there was never actually any testimony offered to show that the [Petitioner] was provoked and that the victim was the first aggressor." The Petitioner avers, in this regard, that lead counsel should have called Harold at the sentencing hearing to establish this mitigating evidence and that lead counsel's failure to do so amounted to ineffective assistance.

The post-conviction court concluded that lead counsel was not ineffective for failing to present any mitigating proof at the sentencing hearing. The post-conviction court reasoned that "[t]he victim testified during the trial and freely admitted and was thoroughly cross-examined by lead counsel about the fact that he was in fact the first aggressor at the earlier incident." The post-conviction court noted that the Petitioner had a "lengthy record and record for violence," which was the basis for imposition of the maximum sentence within the range.

Initially, we observe that the Austin case cited by the Petitioner addresses the Eighth Amendment's requirement that a jury consider the circumstances of the crime and the defendant's background and character during the sentencing phase of a capital trial. 126 F.3d at 848 (citing Boyde v. California, 494 U.S. 370, 377-78 (1990); Lockett v. Ohio, 438 U.S. 586, 604 (1978)). In Austin, the Sixth Circuit noted that the "failure to investigate or present mitigating evidence at sentencing may constitute ineffective assistance of counsel." Id. (citing Glenn v. Tate, 71 F.3d 1204, 1206-08 (6th Cir. 1995), cert. denied, 519 U.S. 910 (1996)). However, that case was a capital case where a defendant's background, character, and mental condition are unquestionably significant. See Richard Lloyd Odom v. State, No. W2015-01742-CCA-R3-PD, 2017 WL 4764908, at *30 (Tenn. Crim. App. Oct. 20, 2017), perm. app. denied (Tenn. Apr. 23, 2018). To the extent that the Petitioner invites this court to expand that court's rationale beyond capital cases, he has failed to provide any argument or authority in support of his position. Accordingly, we decline his invitation to do so. See Craig U. Quevedo v. State, No. M2014-00028-CCA-R3-PC, 2014 WL 5093974, at *8 (Tenn. Crim. App. Oct. 10, 2014) (declining to expand the holding of Goad v. State, 938 S.W.2d 363, 371 (Tenn. 1996), which outlined several significant factors to be considered where the alleged prejudice involved counsel's failure to present sufficient mitigating evidence at sentencing, beyond capital cases).

Here, we simply have no proof that lead counsel failed to investigate the Petitioner's background or the circumstances surrounding the offense. Lead counsel testified that he attempted to interview the witnesses present during the initial altercation

-12-

but that most of them were uncooperative. Associate counsel confirmed that the men "just didn't want to get involved." Moreover, lead counsel was aware that the Petitioner had already received the maximum sentence of fifteen years on the prior aggravated assaults and that "there were no mitigating factors proven at sentencing" for those offenses. Lead counsel believed that the Petitioner "would [also] get a stiff sentence" for this conviction due to the Petitioner's record. According to lead counsel, he "made a number of arguments at the sentencing hearing to get a lower sentence" for the Petitioner, to no avail.

The sentencing hearing transcript reflects that the Petitioner chose not to allocute. Lead counsel argued at the sentencing hearing that "the proof at trial showed some sort of provocation" by the victim. Noting that the victim "struck first," lead counsel continued, "And . . . also there was some information . . . to lead one to reasonably . . . believe that [the Petitioner's] actions were responsive to that of a [first] primary aggressor in this matter." The trial court decided not to mitigate the Petitioner's sentence and imposed the maximum based upon the Petitioner's criminal record and the fact that he was on bond when he committed this offense.

Furthermore, Harold's testimony did little to present any new evidence. While the trial court ruled that the Petitioner had failed to establish entitlement to a self-defense instruction, the proof of the prior altercation that same evening certainly came into evidence at trial. The victim had testified to exactly the same thing. See Johnson, 2014 WL 1004516, at *1. Moreover, the Petitioner indeed had a lengthy criminal record and was on bond when he committed this offense. The Petitioner has not shown that he would have received a different sentence but for lead counsel's alleged error. We agree with the post-conviction court that the Petitioner has failed to establish ineffective assistance.

CONCLUSION

Based upon the foregoing, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE